2016 IL App (2d) 150431
No. 2-15-0431
Opinion filed March 24, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* PHOENIX F., a Minor | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | No. 10-JA-77 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Thomas F., | ) | Maureen J. McIntyre, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Presiding Justice Schostok and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    Thomas F. and Sarah Z. are the biological parents of their son, Phoenix F., born December 19, 2009. Thomas appeals from the trial court's order finding him unfit to parent Phoenix. (Sarah is not a party to this appeal.) We note that Thomas challenges only the finding of his unfitness; he does not challenge the trial court's final order that it was in Phoenix's best interests to terminate Thomas's parental rights. Accordingly, we confine our discussion of the case to the finding of Thomas's unfitness. We affirm.

¶ 2    Prior to Phoenix's birth, Thomas, Sarah, and Sarah's son from a prior marriage, Cameron (born in 2003), lived together in a home in McHenry County. (Cameron is also not a party to this appeal.) Thomas is a veteran who returned home from active duty in Afghanistan in 2008. He suffers from post-traumatic stress disorder, or PTSD, and has had persistent issues with rage and

depression. During the pendency of this case, Thomas engaged in acts of domestic violence against Sarah and Cameron, violated an order of protection by harassing Sarah, threatened suicide, and threatened violence against caseworkers and one of Phoenix's foster parents. Thomas has periodically, although as we'll see not consistently, sought psychiatric treatment for his PTSD.

¶ 3    Sarah by her own admission suffers from substance abuse and has had persistent issues related to her use of heroin and prescription painkillers. Two days after Phoenix's birth, hospital personnel notified the Illinois Department of Children and Family Services (DCFS) that he exhibited symptoms of opioid withdrawal. Sarah admitted to the hospital staff that she had smoked marijuana with Thomas the day before Phoenix was born, and toxicology testing showed cannabinoids in his system. Thereafter, DCFS implemented an "intact service plan" for the family (so named because the family remains intact during the plan's administration). The plan called for Sarah to receive substance abuse treatment and for Thomas to, among other things, receive psychiatric treatment. Thomas and Sarah failed to successfully comply with the intact plan and in October 2010 the State filed a neglect petition alleging that Phoenix was in an environment injurious to his welfare. Around this time, Thomas and Sarah ended their relationship and moved to separate residences.

¶ 4    In April 2011, both Thomas and Sarah stipulated to the majority of the allegations in the State's petition. The trial court adjudicated Phoenix neglected; it also found Thomas and Sarah unfit or unable to care for Phoenix and made Phoenix a ward of the court. Thereafter, DCFS issued Thomas a service plan. The service plan called for Thomas to *inter alia* maintain suitable housing, maintain employment, and participate in and remain compliant with his psychiatric therapy and medication.

¶ 5     In July 2013, the State filed a petition alleging that Thomas was unfit on several grounds and seeking the termination of his parental rights over Phoenix. Relevant here, the petition alleged that Thomas had failed to make "reasonable progress" toward Phoenix's return within each of the three nine-month periods following the April 2011 adjudication of his wardship. 750 ILCS 50/1(D)(m)(ii), (iii) (West 2012). After hearing evidence over five separate court dates, the trial judge issued a 14-page memorandum decision in which she set forth her detailed finding that the State had proved by clear and convincing evidence (see *In re D.T.*, 212 Ill. 2d 347, 361 (2004) (citing *Santosky v. Kramer*, 455 U.S. 745, 768 (1982)) that Thomas had failed to make reasonable progress during each of the three nine-month periods. The court did find that Thomas had maintained a "reasonable degree of interest, concern, or responsibility" as well as "reasonable efforts." Accordingly, those counts in the State's petition were deemed unfounded.

¶ 6     Thomas contends that the trial court erred in finding him unfit on the reasonable-progress counts. Our standard of review is deferential since the trial court was in the best position to assess the credibility of the witnesses as well as the weight given to the evidence and the inferences drawn from the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). Accordingly, we will not disturb the trial court's ruling on appeal unless it was against the manifest weight of the evidence, *i.e.*, unless the opposite result was clearly warranted. *Id.* In this case, the evidence amply supported the trial court's determination.

¶ 7     We focus on the evidence concerning the first nine-month period, as we may affirm a finding of unfitness based on a parent's failure to make reasonable progress in any single nine-month period. *In re J.L.*, 236 Ill. 2d 329, 340 (2010); see also *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006); *In re C.W.*, 199 Ill. 2d 198, 210 (2002) (any one ground, properly proven, is sufficient to enter a finding of parental unfitness). Reasonable progress is measured by an

objective assessment of a parent's progress in a given nine-month period toward reunification with the child, which includes compliance with service plans and court directives. *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). A parent will be found to have made reasonable progress if and only if his or her actions during that period indicate that the court will be able to order that the child be returned home in the near future. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88.

¶ 8     During the relevant nine-month period—from April 15, 2011, to January 15, 2012—Thomas's service plan called for him to, among other things, (1) maintain housing suitable for Phoenix, (2) maintain employment or a source of income suitable to provide for Phoenix, and (3) participate in and remain compliant with his psychiatric therapy and medication. During this time period Thomas made negligible progress on all three fronts. At the time, Thomas resided with his uncle. However, Thomas told caseworkers that he did not want them to inspect his uncle's home and did not believe that his uncle's home should be considered as a possible residence for Phoenix. Thomas was employed part-time as a plumber for several months during the nine months in question, but he lost that job in September 2011. Although caseworkers noted that Thomas had been seeking full-time employment, he failed to obtain a full-time job during the period.

¶ 9     As for his compliance with psychiatric therapy, Thomas repeatedly refused to comply with court orders that he tender his psychiatric records to show that he was actually receiving psychiatric treatment. In November 2011, the court suspended Thomas's supervised visitation with Phoenix until he complied. Thomas released his records the following month and visitation resumed. However, at no time did Thomas produce records showing that he obtained psychiatric treatment during this period. Or, as the trial court noted in its memorandum decision, "During this nine[-]month period[,] Father was not engaged in any verifiable mental health treatment."

Elsewhere, the trial court noted that, while Thomas claimed that he had engaged in psychiatric services during this time, it was unclear what services he was engaging in, what medications he was taking, and who had prescribed them. In addition, we note that a caseworker report reveals that, at a family meeting in December 2011, Thomas stated that he had stopped taking his prescribed antidepressants in July 2011.

¶ 10     As part of his challenge to the trial court's finding of unfitness, Thomas asserts that the comments we have noted from the trial court's written opinion "ha[ve] an undercurrent of burden shifting" concerning evidence of his mental-health treatment. Thomas does not cite any authority to support his position, but relies on boilerplate that the State has the burden of proving parental unfitness by clear and convincing evidence (*In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006); see also *In re D.T.*, 212 Ill. 2d at 361 (citing *Santosky*, 455 U.S. at 768))—a proposition no one disputes. At any rate, we disagree with Thomas's characterization of the trial court's opinion. The court's comments do not indicate that it shifted the burden of proof to Thomas, but rather show that it carefully considered the evidence the State presented regarding Thomas's failure to comply with a key condition of his service plan.

¶ 11     Returning to our discussion of the evidence concerning the first nine-month period, we also note that Thomas's service plan called for him to cooperate with caseworkers, cooperate with Phoenix's foster parents, and abide by any court orders concerning Sarah. Thomas violated all three conditions by threatening caseworkers, by threatening one of Phoenix's foster parents, and by violating an order of protection by harassing Sarah both in person and via text message.

¶ 12     All of the service-plan conditions we have discussed remained throughout each of the three nine-month periods, yet Thomas's failure to comply with these conditions persisted well into the third and final nine-month period. At no time did Thomas engage in recommended

psychiatric treatment. Without such treatment, at no time was it likely that the court could order Phoenix's return to Thomas's custody in the near future. Based on our review of the record, the State presented clear and convincing evidence that Thomas failed to make reasonable progress during the first nine-month period. Accordingly, the trial court's finding that Thomas was unfit was not against the manifest weight of the evidence.

¶ 13                                *Supreme Court Rule 311*

¶ 14    We have said enough to decide this case, but we must comment on how long it took to have this case reviewed. Pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. Feb. 26, 2010), we must issue our decision within 150 days of the filing of the notice of appeal unless there has been "good cause shown." The trial court entered its final order terminating Thomas's parental rights on March 20, 2015. Thomas timely filed his notice of appeal on April 17, 2015. That means that our decision in this case was due by September 14, 2015. However, a decision by that date simply was not possible.

¶ 15    In June 2015, the clerk of this court notified Thomas of the due dates for his briefs and of the need to file a docketing statement. Although Thomas was declared indigent and represented by the public defender in the trial court, the trial court never appointed an attorney to represent him on appeal. Thus, Thomas, now *pro se*, responded to the clerk by filing a motion asking us for an extension of time. Attached to his motion was a letter written to Thomas by the clerk of the circuit court of McHenry County. The letter indicated that the circuit clerk would *not* honor Thomas's request for the record on appeal, because, "at the direction of Judge Maureen McIntyre, [Thomas's] parental rights were terminated and he no longer has access to the [case] file, which as a juvenile matter is impounded by state statute."

¶ 16     To the extent that the circuit clerk was referring to section 1-8 of the Juvenile Court Act, which governs the confidentiality of juvenile-court records (705 ILCS 405/1-8 (West 2012)), we note that the statute specifically provides that "parents" shall have access to juvenile-court records and makes no distinction between parents with intact parental rights and parents whose rights have been terminated (705 ILCS 405/1-8(A)(1) (West 2012)). To the extent that the circuit clerk's letter accurately summarized the trial judge's directive, we know of no reason why an experienced trial judge would adopt such a reading of the statute, effectively denying a parent his or her constitutional right to present a complete challenge to the trial court's findings on direct appeal. See *M.L.B. v. S.L.J.*, 519 U.S. 102, 128 (1996) (holding that states may not withhold from parents a record of sufficient completeness to permit proper appellate review of termination orders). We ordered Thomas to present an affidavit of assets and liabilities to this court, and in September 2015 we entered a limited remand for the appointment of appellate counsel and the preparation of the record on appeal. During all of this, Thomas, who had relocated to Texas and is of limited means, was required to make several trips to Illinois to ensure the proper preparation and presentation of his appeal.

¶ 17     As a result of the foregoing, briefing in this case was not completed until February 25, 2016. Then, once we received the case for decision, we learned that the report of proceedings submitted by the circuit clerk's office was incomplete. This required us to *sua sponte* order additional portions of the record, which we received on March 7, 2016.

¶ 18     We note also that the trial court failed to properly admonish Thomas regarding his appellate rights, which might have had some bearing on the delays in this case. Section 1-5 of the Juvenile Court Act provides that "[u]pon an adjudication of wardship *** the court shall inform the parties of their right to appeal therefrom *as well as from any other final judgment of the*

*court*." (Emphasis added.) 705 ILCS 405/1-5(2)(d)(3) (West 2012). At the conclusion of the dispositional hearing in which Phoenix was declared a ward of the court, the trial court admonished Thomas of what was needed "in the event you want to appeal *this* order" (emphasis added), referring to the dispositional order only. The trial court neglected to tell Thomas that he *also* had the right to appeal from a final order terminating his parental rights if that were to occur. The trial court's failure to admonish Thomas concerning his right to appeal the termination order was consistent with the trial court's later position concerning Thomas's right to obtain the record to pursue his appeal.

¶ 19    We lament that these delays, contrary to the timelines set forth in the Juvenile Court Act and Rule 311(a)(5), effectively left Phoenix and Thomas in limbo for an extended period of time. See *In re D.L.*, 191 Ill. 2d 1, 13 (2000). Nevertheless, Thomas was entitled to a full and fair opportunity to develop and present his position on appeal. Under the circumstances of the present case, including its procedural history, we believe that good cause existed for this decision to be issued after the timeframe mandated by Rule 311(a)(5). In addition, we have published our decision as an opinion to remind the bench and bar of the importance of admonishing respondent parents of their appellate rights, as well as providing them with timely access to the record on appeal.

¶ 20    For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

¶ 21    Affirmed.