2019 IL App (2d) 190497-U
No. 2-19-0497
Order filed November 6, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* L.C., | ) | Appeal from the Circuit Court |
| | ) | of De Kalb County. |
| a minor. | ) | |
| | ) | |
| | ) | No. 15-JA-41 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee v. Matthew C., | ) | Ronald G. Matekaitis |
| Respondent-Appellant) | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in finding respondent unfit and terminating his parental rights.

¶ 2    The minor, L.C., was born in April 2015 to respondent, Matthew C., and her mother, Tanya M. In June 2015, police were summoned to Matthew and Tanya's residence where they learned that, after a night of heavy drinking, Matthew choked Tanya and threatened her with a stun gun while L.C. was present. Matthew was arrested and charged with aggravated domestic battery, unlawful possession of a firearm, and unlawful use of a weapon. This was Matthew's third arrest for domestic battery against Tanya. Unable to post bond, he remained in the county jail and was

eventually convicted (of domestic battery and attempt possession of a firearm by a felon) and sentenced to a 2-year term of imprisonment. As part of Matthew's criminal case, the court entered an order of protection prohibiting Matthew from contact with L.C or Tanya.

¶ 3     In November 2015, police were summoned to Tanya's residence for a well-being check. There, they found Tanya was passed out and intoxicated. There was dog feces "all over the floor" and L.C. was found "covered" in feces. The State filed an initial neglect petition and the Department of Children and Family Services (DCFS) implemented a safety plan requiring that L.C. was to reside with Tanya's parents. In March 2016, Tanya was arrested for stabbing her paramour. She was intoxicated at the time, and L.C. was present in the home, contrary to the safety plan. Protective custody was taken of L.C. An amended neglect petition was filed and both Matthew and Tanya stipulated to an injurious-environment allegation. Subsequently, L.C. was adjudicated neglected and made a ward of the court.

¶ 4     Based on an integrated assessment, Matthew's service plan called for him to obtain a substance abuse evaluation (and follow all recommendations), obtain a mental health assessment (and follow all recommendations), complete a parenting class, obtain employment, obtain suitable housing for L.C., and keep in contact with DCFS about his progress. Matthew was paroled in June 2016 and went to live in a halfway house. The order of protection was still in place however. While on parole, Matthew obtained employment; however, in September 2016, he was arrested for violating the order of protection, which also violated his parole. Matthew was again incarcerated and sentenced to prison.

¶ 5     At a permanency review in January 2017, the trial court found that Matthew had not made reasonable efforts or progress towards L.C.'s return.  As part of the permanency order, the court vacated the order or protection prohibiting visits between L.C. and Matthew, and allowed Matthew

to have supervised visits with L.C. at DCFS's discretion. The record indicates that Matthew had several supervised visits with the minor during his incarceration, although Matthew had failed to complete many of the objectives of his service plan. After a permanency hearing in November 2017, the court found that Matthew had not made reasonable efforts or progress towards L.C.'s return. The court changed L.C.'s permanency goal to substitute care pending the termination of parental rights.

¶ 6    In February 2018, the State filed its petition to terminate Matthew's and Tanya's parental rights. With respect to Matthew, the State's petition alleged that he was unfit in that he: (1) failed to maintain a reasonable degree of interest, concern, or responsibility for L.C.'s welfare (750 ILCS 50/1(D)(b) (West 2016)); (2) failed to make reasonable efforts toward L.C.'s return within 9 months after the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2016)); (3) failed to make reasonable progress towards L.C.'s return within 9 months after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2016)); (4) failed to make reasonable progress towards L.C.'s return during any subsequent 9-month period (750 ILCS 50/1(D)(m)(iii) (West 2016)); and, (5) due to repeated incarceration, was incapable of parenting L.C. (750 ILCS 50/1(D)(s) (West 2016)).

¶ 7    A hearing on the State's petition commenced in September 2018. Tracey Goodman, a DCFS caseworker, testified regarding Matthew's service plans, which spanned the history of this case. Goodman explained that Matthew had no visitation or contact with L.C. prior to January 2017, when the order of protection was modified. After the modification, while in prison, Matthew had weekly supervised visits with L.C. at Hill Correctional Center for 15 to 45 minutes at a time. He also sent some letters or cards to the minor. While Matthew had completed a substance abuse assessment in prison and a mental health assessment at the halfway house, Matthew had not followed up on the treatment recommendations from those assessments. In addition, while in

prison, Matthew was unemployed and did not have safe housing for the minor. Matthew also failed to complete a domestic violence assessment or an anger management course. Goodman testified that prior to the modification of the order of protection in January 2017, Matthew had never requested visitation with the minor through DCFS. Goodman noted that, according to Matthew, he was unable to attend anger management or parenting classes in prison because he was often "writ up" from prison to court in DeKalb County.

¶ 8    Matthew testified that he had been on waiting lists for many of the services and stated that he did not believe he was responsible for his failure to complete services. Matthew also noted that when he was paroled in June 2017, he notified DCFS that he was residing at the halfway house and had found employment. With respect to the order of protection, Matthew testified that he asked his attorney to file a motion to modify the order prior to January 2017, but that his attorney "failed to do so."

¶ 9    During closing arguments, Matthew's counsel repeatedly emphasized that L.C. was not in Matthew's care when protective custody was taken in November 2015 and March 2016, as he was in prison. Matthew's attorney also noted that Matthew could not complete many of the requirements of his service plan due to the limitations placed on him during his incarceration, his parole, and his incarceration again.

¶ 10    The trial court issued a 10-page, single-spaced, memorandum decision finding both Tanya and Matthew unfit as alleged in the State's petition. With respect to Matthew's testimony that he had attempted to have the order of protection modified so that he could visit with L.C., the trial court found his testimony was not credible.

¶ 11    At a best-interests hearing, a DCFS case manager testified that neither Matthew nor Tanya had suitable housing for L.C. In addition, neither Matthew nor Tanya had ever progressed to unsupervised visitation with L.C.

¶ 12    L.C.'s foster mother testified that L.C. had resided with her foster mother, foster father, and five foster siblings for the preceding three years. L.C. refers to her foster parents as "Mom" and "Dad" and her foster siblings as her "brothers and sisters." When L.C. came to her foster parents, she was 10 months' old. At that time, L.C.'s sensory and motor skills were delayed. Since that time, L.C.'s foster parents engaged her in weekly developmental therapy and L.C. was enrolled in preschool where she was "doing a great job." L.C.'s foster mother testified that L.C. was learning how to ride a bike, and enjoys playing outside with her foster siblings. The family eats meals together and attends church together. In addition, L.C.'s foster parents would pray with her, read to her, and sing to her each night before bedtime.

¶ 13    After the hearing, the trial court found that it was in L.C.'s best interests to terminate both Matthew's and Tanya's parental rights. Matthew appeals.

¶ 14    We focus on the evidence concerning the first nine-month period, as we may affirm a finding of unfitness based on a parent's failure to make reasonable progress in any single nine-month period. *In re J.L.*, 236 Ill.2d 329, 340 (2010); see also *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006); *In re C.W.*, 199 Ill. 2d 198, 210 (2002) (any one ground, properly proven, is sufficient to enter a finding of parental unfitness). Reasonable progress is measured by an objective assessment of a parent's progress in a given nine-month period toward reunification with the child, which includes compliance with service plans and court directives. *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). A parent will be found to have made reasonable progress if and only if his or her actions during that period indicate that the court will be able to order that the child be returned home in

the near future. *In re Phoenix F.*, 2016 IL App (2d) 150431, ¶ 7. Conversely, the failure to make reasonable progress includes the parent's failure to substantially fulfill his or her obligations under the service plan. *Id.* In order to reverse a finding of parental unfitness, the reviewing court must conclude that the trial court's finding was against the manifest weight of the evidence, meaning that the opposite conclusion was clearly apparent. *In re C.N.*, 196 Ill. 2d at 208.

¶ 15    In the trial court, service plans were introduced that covered the initial nine-month period after adjudication—*i.e.*, April 29, 2016 through January 29, 2017. Those service plans called for Matthew to establish and maintain a suitable residence for L.C.'s care; for Matthew to establish and maintain visitation with L.C.; for Matthew to comply with all court orders; and for Matthew to obtain assessments and begin services for parenting classes, domestic violence counseling, psychiatric treatment, and substance abuse treatment. Matthew was also required to keep in contact with his DCFS caseworker and inform her of his whereabouts.

¶ 16    During the initial phase of this nine-month period, Matthew was incarcerated. He was paroled in June 2016 and informed the caseworker that he would be residing at a halfway house. Matthew also briefly obtained employment. Throughout this nine-month period, a no-contact order prevented Matthew from having visitation with L.C. According to the caseworker, Matthew never inquired about visitation during this time period, nor sought to have the court order modified. After his brief residence at the halfway house, Matthew moved to a friend's apartment. The caseworker determined that throughout the summer, Matthew had violated the court order by visiting Tanya in nearby hotel rooms, and by attempting to reside with Tanya at his friend's apartment. In September 2017, Matthew was arrested near Tanya's residence for violating the court's order of protection and returned to prison until August 2018.

¶ 17    After his initial release in June, Matthew did complete a mental health assessment, but never engaged in or completed the recommended service of individual counseling. Matthew also failed to complete parenting classes and remained on "wait lists" for a substance abuse assessment, a psychiatric evaluation, and an anger management course. When it was pointed out that Matthew could potentially seek out these services from alternative providers, he did not do so. Rather, he appeared content to remain waitlisted. Matthew also failed to keep in touch with the caseworker, who described her numerous unsuccessful attempts to contact him regarding his daughter and his progress under the service plan. Thus, during this time period, all of the goals of Matthew's service plans were rated unsatisfactory.

¶ 18    Matthew argues that it was "impossible" for him to correct the conditions that were the basis for L.C.'s removal, as L.C. was not in his care at the time of adjudication. Like the trial court, we find this argument unpersuasive. The basis for L.C.'s removal and wardship was (largely) her exposure to domestic violence in the home. In addition, we note that L.C. was solely in her mother's care in the run up to adjudication because Matthew was incarcerated for an act of domestic violence against L.C. We are given pause by the fact that, by Matthew's own admission, this was his *third* arrest for an act of domestic violence against Tanya. In any event, in order to correct the condition that brought L.C. into care, even when Matthew was paroled, he needed to *inter alia* abide by the service plans and court orders. Instead, Matthew was re-incarcerated for violating the court's order of protection by seeing Tanya. As indicated by Matthew's service plan, the conditions that caused L.C. to become a ward of the court was her parent's failure to provide her with a safe, secure, violence- and substance-free home. During the initial nine-month period Matthew was still unwilling or unable to provide L.C. with the home she needed. In addition, during this period, Matthew never sought visitation with L.C. We acknowledge that Matthew was

incarcerated for roughly six combined months during the relevant nine-month period, but that, too, does not excuse his lack of progress. See *In re J.L.*, 236 Ill. 2d 329, 341-43 (2010) (it is well-settled that a respondent's incarceration during the relevant nine-month period for demonstrating reasonable progress will not excuse lack of progress and will not toll the relevant time period).

¶ 19 We also note that respondent did not appeal the dispositional order, which encompassed the trial court's finding that A.B. was neglected due to being exposed to drugs and which encompassed the court-ordered tasks for respondent to complete that were entered as part of the dispositional order. See *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 65 (citing *In re Barion S.,* 2012 IL App (1st) 113026, ¶ 36 (the dispositional order is a final and appealable order and the proper vehicle to appeal a finding of abuse or neglect)). Nor did respondent take issue with the service plan in the trial court. See 705 ILCS 405/2-23 (West 2018) (if the court finds services in a plan will not reasonably accomplish the permanency goal, the court shall enter such a finding in writing, based on evidence taken, and enter an order for a new service plan to be created and served on all parties within 45 days). Additionally, respondent has taken no issue with any specific permanency review finding made by the trial court in this case. See 705 ILCS 405/2-28(2) (West 2018) (the trial court is required to make findings at the permanency review hearing as to whether the services in the service plan require anything that is not reasonably related to remedying a condition or conditions that gave rise or which could give rise to any finding of child abuse or neglect).

¶ 20 Here, respondent failed to complete his obligations under the service plan during the relevant nine-month period—including counseling, visitation, compliance with court orders, and maintaining contact with DCFS. The evidence showed that L.C. could not be returned to Matthew's care in the "near future" especially during this time period. Accordingly, the trial

court's finding that respondent was unfit pursuant to section 1(D)(m)(ii) of the Adoption Act because he failed to make reasonable progress during the nine-month period of April 2016 to January 2017, was not against the manifest weight of the evidence. Because only one ground for a finding of unfitness is necessary to uphold a circuit court's finding of parental unfitness, we need not review contentions regarding the other bases of the trial court's findings of unfitness. See *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005) (parental rights may be terminated where there is a single alleged ground for unfitness supported by the evidence).

¶ 21    In a nearly one-page argument, Matthew next contends that it was not in L.C.'s best interests to terminate his parental rights. Once a trial court has found a parent unfit, considerations regarding parental rights yield to the best interest of the child. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 42. The court must consider a number of statutory factors in the context of the child's age and developmental needs, including physical safety and welfare, familial and community ties, and the least disruptive placement. 705 ILCS 405/1-3(4.05)(a-j) (West 2018). The trial court's decision on best interest is also reviewed under the manifest-weight standard. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 43.

¶ 22    We find Matthew's challenge to the trial court's best interest finding is meritless. Here, the evidence showed that L.C. has been under DCFS supervision "[p]retty much all her life." The evidence also showed that L.C. was quite close with a loving and warm foster family, including her foster parents and foster siblings. She was physically safe in her foster home and progressing well in preschool. In addition, L.C.'s foster family was committed to her adoption. By contrast, at no time during this case had Matthew provided L.C. with a safe home. Furthermore, even after the order of protection was modified, at no time had Matthew progressed beyond supervised visitation with L.C. Like the trial court, while we do not discount Matthew's progress towards completing

some of his service-plan goals towards the end of this case, but the fact remains that his progress throughout this case was minimal at best. After carefully reviewing the record in this case, we agree with the trial court that L.C. could not be returned to Matthew within the foreseeable future.

¶ 23     For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 24     Affirmed.