2019 IL App (2d) 190527-U
No. 2-19-0527
Order filed November 18, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* L.C., | ) | Appeal from the Circuit Court |
| | ) | of De Kalb County. |
| a minor. | ) | |
| | ) | |
| | ) | No. 15-JA-41 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee v. Tanya M., | ) | Ronald G. Matekaitis |
| Respondent-Appellant) | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in finding respondent unfit and terminating her parental rights.

¶ 2    The minor, L.C., was born in April 2015 to respondent, Tanya M., and Matthew C. In June 2015, police were summoned to Matthew and Tanya's residence where they learned that, after a night of heavy drinking, Matthew choked Tanya and threatened her with a stun gun while L.C. was present. Matthew was arrested and charged with aggravated domestic battery, unlawful possession of a firearm, and unlawful use of a weapon. This was Matthew's third arrest for domestic battery against Tanya. Matthew was eventually convicted of domestic battery and

attempt possession of a firearm by a felon and sentenced to a 2-year term of imprisonment. As part of Matthew's criminal case, the court entered an order of protection prohibiting Matthew from contact with L.C or Tanya.

¶ 3    In November 2015, police were again summoned to Tanya's residence for a well-being check. There, they found Tanya was passed out and intoxicated. There was dog feces "all over the floor" and L.C. was found "covered" in feces. The State filed an initial neglect petition and the Department of Children and Family Services (DCFS) implemented a safety plan requiring that L.C. was to reside with Tanya's parents.

¶ 4    In March 2016, Tanya was arrested for stabbing her new paramour. She was intoxicated at the time, and L.C. was present in the home, all contrary to the safety plan. (The record indicates that Tanya stabbed her paramour because he attempted to either take away or pour out her beer.) Protective custody was taken of L.C. and an amended neglect petition was filed. Both Matthew and Tanya stipulated to an injurious-environment allegation in the amended neglect petition. L.C. was then adjudicated neglected and made a ward of the court.

¶ 5    As part of her pending criminal cases, and due to her history of substance abuse, Tanya had been admitted to DeKalb County's drug court program. In addition, based upon an integrated assessment, DCFS created service plans for Tanya. Tanya's service plans called for her to obtain a substance abuse evaluation (and follow all recommendations), obtain a mental health assessment (and follow all recommendations), complete a parenting class, remain drug and alcohol free, obtain employment, obtain suitable housing for L.C. Although the only matter before us concerns these abuse and neglect proceedings, we note that the terms of Tanya's drug court treatment plan closely tracked the terms of her DCFS service plans.

¶ 6      As part of her drug court participation, Tanya was released from jail to complete a 90-day inpatient treatment program during the summer of 2016. Meanwhile, Matthew was paroled in June 2016; however, the order of protection was still in place. Shortly after Matthew's parole, DCFS caseworker Tracey Goodman discovered that Matthew and Tanya had been seeing each other, romantically, in violation of Matthew's no-contact order. In September 2016, Matthew was arrested near the halfway house for violating the order of protection, which also violated his parole. Matthew was again incarcerated and sentenced to prison.

¶ 7      In September 2016, Tanya was discharged from inpatient care to a halfway house for continuing treatment. Tanya's stay at the halfway house was short lived, however. While at the halfway house, Tanya tested positive for both alcohol and amphetamines. The final straw came when Tanya was found to have violated the house rules by having a male visitor in the home. After the incidents at the halfway house, Tanya was briefly jailed before the drug court returned Tanya to a second 90-day inpatient program. In October 2016, Tanya's home monitoring device twice alerted that she had consumed alcohol. Then, in December 2016, Tanya was discharged from the inpatient program 67 days in for violating the program's confidentiality and safety rules (she posted a picture of the facility and its residents on Facebook). Staff in the program noted that Tanya was often hostile and denied she needed treatment. Tanya indicated that she posted the picture with full awareness that it was against the rules and in the hope that her conduct would get her discharged.

¶ 8      Tanya did complete a parenting class during her initial inpatient stay; however, we note that throughout her incarceration, inpatient treatments, and brief residency at the halfway house, Tanya refused most offers for supervised visitation with L.C. or simply did not show up.

¶ 9 At a permanency review in January 2017, the trial court found that Tanya had not made reasonable efforts or progress towards L.C.'s return. During the subsequent months, Tanya completed inpatient treatment but ultimately made little progress. Tanya failed to participate in (court-ordered) psychiatric treatment and refused to take prescribed psychotropic medication. Ultimately, Tanya was discharged unsuccessfully from drug court. After a permanency hearing in November 2017, the court found that Tanya had not made reasonable efforts or progress towards L.C.'s return. The court changed L.C.'s permanency goal to substitute care pending the termination of parental rights.

¶ 10 In February 2018, the State filed its petition to terminate Matthew's and Tanya's parental rights. With respect to Tanya, the State's petition alleged that she was unfit in that she: (1) failed to maintain a reasonable degree of interest, concern, or responsibility for L.C.'s welfare (750 ILCS 50/1(D)(b) (West 2016)); (2) failed to make reasonable efforts toward L.C.'s return within 9 months after the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2016)); (3) failed to make reasonable progress towards L.C.'s return within 9 months after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2016)); (4) failed to make reasonable progress towards L.C.'s return during any subsequent 9-month period (750 ILCS 50/1(D)(m)(iii) (West 2016)); and, (5) due to repeated incarceration, was incapable of parenting L.C. (750 ILCS 50/1(D)(s) (West 2016)).

¶ 11 A hearing on the State's petition commenced in September 2018. Tracey Goodman, a DCFS caseworker, testified regarding Tanya's service plans, which spanned the history of this case. Goodman explained that Tanya had significant psychiatric issues that, especially when coupled with substance abuse, left her particularly susceptible to intimate-partner violence. Goodman further explained that Tanya had often refused offered counseling and treatment services

as well as supervised visitation with L.C. Moreover, despite the nearly three-year history of this case, at no time was Tanya employed or in possession of suitable housing for L.C.

¶ 12    During closing arguments, Tanya's counsel repeatedly emphasized that Tanya's "relapses" were not her "fault" but were rather part of her condition. The trial court issued a 10-page, single-spaced, memorandum decision finding both Tanya and Matthew unfit as alleged in the State's petition. With respect to Tanya, the court found that she had repeatedly engaged in "narcissistic" behavior and that Tanya simply had not made the efforts necessary to correct her life or to have L.C. returned to her care. In particular, the court noted that Tanya was not discharged from any program for "relapsing"; rather, Tanya was discharged from each program (and from drug court altogether) for intentional conduct in violation of the rules.

¶ 13    At a best-interests hearing, a DCFS case manager testified that neither Matthew nor Tanya had suitable housing for L.C. In addition, neither Matthew nor Tanya had ever progressed to unsupervised visitation with L.C.

¶ 14    L.C.'s foster mother testified that L.C. had resided with her, her foster father, and five foster siblings for the preceding three years. L.C. refers to her foster parents as "Mom" and "Dad" and her foster siblings as her "brothers and sisters." When L.C. came to her foster parents, she was 10 months' old. At that time, L.C.'s sensory and motor skills were delayed. Since that time, L.C.'s foster parents engaged her in weekly developmental therapy and L.C. was enrolled in preschool where she was "doing a great job." L.C.'s foster mother testified that L.C. was learning how to ride a bike, and enjoys playing outside with her foster siblings. The family eats meals together and attends church together. In addition, L.C.'s foster parents would pray with her, read to her, and sing to her each night before bedtime.

¶ 15    After the hearing, the trial court found that it was in L.C.'s best interests to terminate both Matthew's and Tanya's parental rights. Tanya appeals.

¶ 16    We focus on the evidence concerning the first nine-month period, as we may affirm a finding of unfitness based on a parent's failure to make reasonable progress in any single nine-month period. *In re J.L.*, 236 Ill.2d 329, 340 (2010); see also *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006); *In re C.W.*, 199 Ill. 2d 198, 210 (2002) (any one ground, properly proven, is sufficient to enter a finding of parental unfitness). Reasonable progress is measured by an objective assessment of a parent's progress in a given nine-month period toward reunification with the child, which includes compliance with service plans and court directives. *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). A parent will be found to have made reasonable progress if and only if his or her actions during that period indicate that the court will be able to order that the child be returned home in the near future. *In re Phoenix F.*, 2016 IL App (2d) 150431, ¶ 7. Conversely, the failure to make reasonable progress includes the parent's failure to substantially fulfill his or her obligations under the service plan. *Id.* In order to reverse a finding of parental unfitness, the reviewing court must conclude that the trial court's finding was against the manifest weight of the evidence, meaning that the opposite conclusion was clearly apparent. *In re C.N.*, 196 Ill. 2d at 208.

¶ 17    In the trial court, service plans were introduced that covered the initial nine-month period after adjudication—*i.e.*, April 29, 2016 through January 29, 2017. Those service plans called for Tanya to establish and maintain a suitable residence for L.C.'s care; for Tanya to establish and maintain visitation with L.C.; for Tanya to comply with all court orders; and for Tanya to obtain assessments and begin services for parenting classes, domestic violence counseling, psychiatric treatment, and substance abuse treatment. During this time, Tanya completed a parenting class and a single 90-day course of inpatient treatment. However, she was also unsuccessfully discharged

from the halfway house, a second 90-day inpatient program, and eventually drug court due to her unwillingness or inability to abide by each program. Throughout this nine-month period, the record reflects that Tanya failed to take her own welfare and treatment seriously. Furthermore, the record shows that Tanya had minimal interest in establishing and maintaining a relationship with L.C. through supervised visitation. Although we recognize that Tanya was repeatedly incarcerated for several brief intervals during this nine-month period, her incarceration in no way excuses her failure to comply with the terms of her service plans. See *In re J.L.*, 236 Ill. 2d 329, 341-43 (2010) (it is well-settled that a respondent's incarceration during the relevant nine-month period for demonstrating reasonable progress will not excuse lack of progress and will not toll the relevant time period). We agree with the trial court that, during this nine-month period, Tanya made *no* real progress towards unsupervised visitation, employment, or establishing a suitable home for L.C.'s care.

¶ 18　　Here, Tanya failed to complete her obligations under the service plan during the relevant nine-month period. The evidence showed that L.C. absolutely could not be returned to Tanya's care in the "near future," especially during this time period. Accordingly, the trial court's finding that respondent was unfit pursuant to section 1(D)(m)(ii) of the Adoption Act because she failed to make reasonable progress during the nine-month period of April 2016 to January 2017, was not against the manifest weight of the evidence. Because only one ground for a finding of unfitness is necessary to uphold a circuit court's finding of parental unfitness, we need not review contentions regarding the other bases of the trial court's findings of unfitness. See *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005) (parental rights may be terminated where there is a single alleged ground for unfitness supported by the evidence).

¶ 19    In an argument slightly less than two pages long, Tanya next contends that it was not in L.C.'s best interests to terminate her parental rights. Once a trial court has found a parent unfit, considerations regarding parental rights yield to the best interest of the child. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 42. The court must consider a number of statutory factors in the context of the child's age and developmental needs, including physical safety and welfare, familial and community ties, and the least disruptive placement. 705 ILCS 405/1-3(4.05)(a-j) (West 2018). The trial court's decision on best interest is also reviewed under the manifest-weight standard. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 43.

¶ 20    We find Tanya's challenge to the trial court's best interest finding is meritless. Here, the evidence showed that L.C. has been under DCFS supervision "[p]retty much all her life." The evidence also showed that L.C. was quite close with a loving and warm foster family, including her foster parents and foster siblings. She was physically safe in her foster home and progressing well in preschool. In addition, L.C.'s foster family was committed to her adoption. Although, during the later stages of this case, Tanya made some progress—she began to work with a parenting coach and eventually obtained a residence (with a new paramour)—it was minimal. In contrast, as the trial court noted, L.C. has been in care nearly all of her life, and had resided with her foster parents for the preceding three years. Even unsupervised visitation with Tanya and L.C. had not taken place for years. Like the trial court, while we do not discount Tanya's progress towards completing some of his service-plan goals towards the end of this case, but the fact remains that her progress and efforts throughout this case were slight at best. After carefully reviewing the record in this case, we agree with the trial court that L.C. could not be returned to Tanya within the foreseeable future and that it was in the minor's best interests to terminate Tanya's parental rights.

¶ 21    Before concluding, we note that pursuant to Supreme Court Rule 311(a), our disposition in this matter was due by Monday, November 11, 2019. Our review in this case was delayed by an extension of time to file the appellant's brief as well as the circuit clerk's idiosyncratic practice of combining the court file and transcripts (which were out of order) into a single cumbersome electronic file. Under the circumstances, we find that good cause has been shown.

¶ 22    For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 23    Affirmed.