NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190790-U

NO. 4-19-0790

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 2, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* I.S., R.M., Tomi. J., and Toma. J., Minors | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
|       Petitioner-Appellee, | ) | No. 17JA76 |
|       v. | ) | |
| Jennifer M., | ) | Honorable |
|       Respondent-Appellant). | ) | Brett N. Olmstead, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Presiding Justice Steigmann and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, granting appellate counsel's motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), in the absence of meritorious issues to raise on appeal.

¶ 2    On September 30, 2019, the trial court terminated the parental rights of respondent, Jennifer M., as to her children I.S. (born March 15, 2012), R.M. (born August 1, 2009), Tomi. J. (born December 6, 2006), and Toma. J. (born January 26, 2008). Respondent fathers, Tommy J., Davey S., and Nicholas J. are not parties to this appeal. On appeal, respondent argues the trial court's judgment terminating her parental rights was against the manifest weight of the evidence.

¶ 3    Pursuant to *Anders v. California*, 386 U.S. 738 (1967), respondent's appellate attorney moves to withdraw as counsel. See *In re S.M.*, 314 Ill. App. 3d 682, 685-86, 732 N.E.2d 140, 143 (2000) (holding *Anders* applies to termination of parental rights cases and

providing the proper procedure to be followed by appellate counsel). Counsel states he read the record in this case. According to counsel, after his review, he concluded this case presents no viable grounds for an appeal and any appeal would be "frivolous." He supported his motion with a brief containing potential issues and argument as to why the issues lack merit. Counsel mailed respondent a copy of his motion and brief. After examining the record and executing our duties consistent with *Anders*, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5                                  A. Initial Proceedings

¶ 6         In December 2017, the State filed a petition for adjudication of neglect, amended in February 2018, alleging (1) I.S., R.M., Tomi. J., and Toma. J. were neglected in that their environment was injurious to their welfare when they resided with respondent or respondent father Tommy J. due to exposure to domestic violence (705 ILCS 405/2-3(1)(b) (West 2016)) and (2) I.S. was neglected in that her environment was injurious to her welfare when she resided with respondent father Davey S. due to exposure to substance abuse (705 ILCS 405/2-3(1)(b) (West 2016)). In May 2018, the trial court entered an adjudicatory order finding I.S., R.M., Tomi. J., and Toma. J. neglected. In a June 2018 dispositional order, the trial court (1) made I.S., R.M., Tomi. J., and Toma. J. wards of the court, (2) found all respondent fathers unfit, (3) ordered the children remain in the custody of respondent, whom it determined to be fit, and (4) placed guardianship with the Department of Children and Family Services (DCFS).

¶ 7         At a September 2018 permanency review hearing, the trial court determined respondent failed to make (1) reasonable efforts and (2) reasonable and substantial progress toward reunification. The court found respondent mother unfit (1) due to her inability to control

"the escalating and dangerous behavior of [Tomi. J. and Toma. J.]" and (2) because rather than engage in services with DCFS, she missed multiple service appointments and hid information from DCFS. The court removed custody of all four children from respondent and placed them in the care of DCFS.

¶ 8                                    B. Termination Proceedings

¶ 9          In May 2019, the State filed a motion for termination of respondent's parental rights. The State alleged respondent was an unfit parent because she failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to I.S.'s, R.M.'s, Tomi. J.'s, and Toma. J.'s welfare (750 ILCS 50/1 (D)(b) (West 2018)) (count I) and (2) make reasonable progress toward the return of I.S., R.M., Tomi. J., and Toma. J. within nine months after an adjudication of neglect, specifically August 10, 2018, to May 10, 2019 (750 ILCS 50/1 (D)(m)(ii) (West 2018)) (count II).

¶ 10                                    1. *Fitness Hearing*

¶ 11         On August 19, 2019, the trial court conducted a bifurcated hearing on the motion for termination of parental rights, first considering respondent's fitness. Respondent failed to attend the fitness hearing but was represented by counsel. The parties presented the following relevant testimony.

¶ 12                                    a. Whitney Welch

¶ 13         Whitney Welch, a child welfare specialist for DCFS, testified she served as the caseworker on respondent's case from the beginning of the case through November 2018. Welch testified she assessed respondent for services, including mental-health counseling, parenting classes, and a psychological evaluation. In July 2018, Welch referred respondent to Cognition Works for mental-health counseling and parenting classes. Welch testified Cognition

Works reported that respondent scheduled an appointment but failed to show up. Respondent never completed mental-health treatment.

¶ 14       Welch testified she never referred respondent for a psychological evaluation because DCFS did not have the supporting documentation—mental-health assessment, parenting assessment, sufficient visitation notes—to make a referral. Welch failed to recall if she made a recommendation for substance-abuse services for respondent, but she testified that there were concerns with respondent's substance abuse. Welch testified that near the end of her time as caseworker, respondent received methadone treatments and tested positive for substances other than methadone.

¶ 15       Welch testified she maintained contact with respondent through text messages but that she had difficulty reaching respondent. Respondent engaged in supervised visitation once per week for two hours in the community. Welch testified respondent exercised visitation consistently but that she never recommended expanding visitation or changing the level of supervision because of reports that visits were often "very chaotic[,]" where respondent exhibited difficulty managing the children's behavior.

¶ 16                              b. Atrous Lollar

¶ 17       Atrous Lollar, a child welfare specialist for DCFS, testified she previously worked on respondent's case from November 21, 2018, to June 31, 2019, while employed with Lutheran Social Services of Illinois (LSSI). Lollar testified that when she first took over respondent's case, she maintained frequent contact with respondent because she supervised respondent's visits with her children. Lollar also testified that in the beginning respondent consistently attended visits. Of the visits, Lollar testified,

- 4 -

> "They were very chaotic at one point. If the boys didn't get something they wanted they would show out and be very disrespectful. [Respondent] also was not appropriate with the children. She would get mad at them very quickly and blame them for why they came into care, and it just went really bad from there."

¶ 18 Lollar testified that visits between respondent and her children were conducted at McDonald's from November 2018 to January 2019, when they moved to the LSSI office. Lollar testified that visits moved back to McDonald's in February 2019 but that eventually she suspended visits on April 3, 2019. Lollar suspended visits between respondent and her children where,

> "[respondent] was very inappropriate with the children. The children was [*sic*] very uncomfortable that day. Some things transpired with the boys, and she wasn't really talking and cold with them, and it wasn't acceptable. And so the next week, we decided to reach out to the Court to see if we can suspend those visits."

¶ 19 Lollar never recommended expanding visitation because respondent "wasn't consistent." Lollar testified that respondent failed to attend or cancelled visits in the six weeks prior to April 3, 2019. In February 2019, respondent failed to maintain contact with Lollar, and in March 2019, respondent's whereabouts were unknown. After a hearing in April 2019, respondent informed Lollar that she resided with her stepfather in Urbana, Illinois. With regard to consistency of visits, Lollar stated,

"[W]e had an incident where she felt like I was teaching her or trying to show her how to parent her kids. They—it was a lot of chaos going on because we had moved the visits to our office at [LSSI] in Savoy because it was so chaotic. There was so much going on, too many children doing different things, so we moved it to the office, and she didn't like that. She had trouble getting there on the bus, and then visits just slowly stopped. She started making excuses on how she felt uncomfortable leaving the visits and having to go to work on a bus and being upset because of how chaotic things were, so she slowly stopped attending regularly."

¶ 20    For services, respondent told Lollar she participated in parenting classes and was sent to Cognition Works for domestic-violence classes and individual counseling but there was a wait list. Lollar testified that in January 2019, she made referrals for respondent at Cognition Works for domestic-violence counseling and individual counseling. When Lollar asked respondent if she attended those services at Cognition Works, respondent stated that "because she [was] still finishing up parenting, she went in and talked to one of the workers there, and they stated that she wasn't going to be able to start until a few weeks after I had already talked to her about it, and also that it wouldn't be until—it would be on Wednesdays, so it would be interfering with her visitation schedule." Lollar testified that to her knowledge, respondent never completed any counseling services at Cognition Works.

¶ 21    Lollar set up times for respondent to provide urine drops at Rosecrance. In January 2019, Lollar spoke with respondent about her substance abuse after respondent testified positive for methadone and benzodiazepines in January 2019 and February 2019. Respondent

indicated to Lollar that she had a prescription for the benzodiazepines. Respondent never provided proof of that prescription. Respondent also testified positive for cocaine in March 2019. Respondent stopped providing urine drops in April 2019.

¶ 22 Lollar testified that at no point was she able to plan for the return home of any of the children to respondent. Lollar stated,

> "[I]t's obvious that she wasn't involved in the services. She wasn't completing her parent-child visits. They were suspended at one point up until the May 2019 hearing, and they were reinstated, and we tried to get her reengaged with services and make sure she comes to her parent-child visits, and she just didn't reach out. She did attempt me at one point with a call, but when I called back, she never answered. I left emails. I still continued to try to drop her. She just never responded. I sent her ACI reminders. Court hearing reminders, and she just never reached back out."

¶ 23                                    c. Debbie Nelson

¶ 24 Debbie Nelson, the director of Cognition Works, testified that she assessed respondent for services in April 2019. Nelson recommended respondent participate in the Options program, which is a program for victims of domestic violence that meets once a week for 24 weeks. Nelson testified that respondent started the class in May 2019 and last attended in June 2019. From May to June, respondent had one absence. Nelson facilitated the discussion in the group and stated that respondent participated when she attended. Nelson did not know why respondent stopped attending.

¶ 25          d. Tammy Griffin

¶ 26          Tammy Griffin, a counselor at Champaign Treatment Center, an outpatient methadone clinic, testified that starting in August 2018 respondent received methadone daily. Griffin never engaged in regular meetings with respondent because respondent would make appointments but never show up. Griffin testified that respondent denied having a substance-abuse problem even when results showed otherwise, including tampering and use of cocaine and opioids. In July 2019, respondent exhibited clean urine drops and progressed to the second of five phases in the clinic's treatment program.

¶ 27          Griffin testified that respondent talked to her about her DCFS service plan, "but all she would do was complain about her caseworker and that she was very mean to her and that she was getting nothing done, but that she was participating in services." Griffin testified she only recently found out that respondent stopped participating in services over a month ago. At times, Griffin forced respondent to see her by instructing the nurses to withhold methadone until respondent saw her.

¶ 28          Griffin testified she saw respondent in the morning on the day she testified. Griffin stated,

> "And then today, she had an appointment with me at 6:30 this morning. She did not show. So I called her. She's pregnant. She needs to dose regularly. I called her, and it was 12:30, I said, 'Jen, are you coming in?' You—and she said, 'Are there people there waiting there with [*sic*] me with papers?' I said, 'No, This is not a trick. I just—It's me. I would like to talk to you before we go to Court.' "

Griffin testified that respondent came in at 12:50 and she dosed. Then, she told Griffin she was not going to court and that "[s]he didn't want anything to do with this anymore, that who had the kids she wants to have—have the kids and that she wants off paper."

¶ 29 When asked if she believed respondent could benefit from additional services, Griffin stated that she believed respondent would benefit from mental health and anger management services. Griffin also testified to the necessity of respondent continuing the methadone program with Champaign Treatment Center because of her pregnancy.

¶ 30 e. Parenting Education Group Final Report

¶ 31 The trial court accepted into evidence a parenting education group final report from Cognition Works for respondent, showing she began a 12-week parenting course in October 2018 and only missed one class. The report said,

"[Respondent] chose to participate in the group discussions and shared the written homework with other group members. She was willing to share her own experiences and challenges in parenting. She often asked questions of facilitators and group members and expressed interest in learning the skills and using them with her children. She was willing to hear feedback from group members and facilitators. Her active participation in the group, as well as her interest in and questions about the material, contributed to the discussions.

[Respondent] can identify her own Maladaptive Thinking Patterns (MTPs) and Tactics to avoid being held accountable as well as those of her children. She developed an understanding of

the relationship between thinking and choices as they apply to behaviors, feelings, and attitudes. She learned about the value of using choice language in holding her children accountable for irresponsible (or responsible) behaviors. She developed a Framework for accountability with identified Expectations and Consequences to use as an effective tool in holding her children accountable. We encourage her to utilize the Framework at home as a structure for accountability."

¶ 32                    f. Trial Court's Findings

¶ 33        The trial court took judicial notice of the orders entered in the case and any motions or petitions upon which the orders were based to explain what the orders meant.

¶ 34        Following the fitness hearing, the trial court found the State proved respondent unfit by clear and convincing evidence. On count I, the court found that while respondent initially maintained interest in her case, by the spring of 2019, respondent almost completely removed herself from participation in anything with DCFS, other than inconsistently attending visits. Moreover, when she did attend visits, she lacked the ability to manage the children effectively. The court in analyzing the evidence stated that it was only considering testimony and evidence up until the filing of the motion for termination of respondent's parental rights in May 2019. The court considered the challenges to respondent and determined that respondent "consistently express[ed] an interest or concern about the children, but the State has proved by clear and convincing evidence that she failed to maintain a reasonable degree of responsibility as to the welfare of the children."

¶ 35    On count II, the court found the State established that respondent failed to make reasonable progress toward the return of I.S., R.M., Tomi. J., and Toma. J. by May 10, 2019. The court reiterated that by May 10, 2019, respondent had "largely walked away from any meaningful investment in making the kind of progress that she would have to make to correct the problems and create a situation where the children could be returned to her in the near future."

¶ 36    On August 19, 2019, the trial court entered an adjudicatory order finding respondent unfit.

¶ 37                            2. *Best-Interest Hearing*

¶ 38    On September 30, 2019, the trial court held a best-interest hearing. Respondent failed to attend the best-interest hearing but was represented by counsel. The court considered the record and best-interest reports from LSSI and court-appointed special advocates (CASA).

¶ 39    LSSI submitted a best-interest report indicating respondent failed to maintain a stable residence and often resided with family and friends. Respondent had not been in contact with LSSI since April 2019. Further, respondent failed to consistently submit to drug screens and tested positive when she did undergo drug screens. Respondent attended some recommended services but only completed parenting classes. Respondent last visited I.S., R.M., Tomi. J., and Toma. J. in April 2019. All four children remained in relative foster care and were doing well. Tomi. J. and Toma. J. both exhibited a different attitude and demeanor since placement with their current foster parents. R.M. and I.S. did not fully understand all that was happening in the case but appeared to be thriving in their foster placements and expressed a desire to remain in their current home forever.

¶ 40    CASA's best-interest report mirrored LSSI's report. Both CASA and LSSI went through the best-interest factors and recommended terminating respondent's parental rights.

¶ 41     After hearing recommendations from counsel and considering the best-interest factors, the trial court found respondent "absented herself from these proceedings[,]" and expressed the desire to discontinue involvement with DCFS where she stated that "[s]he didn't want anything to do with this anymore, that who had the kids she wants to have—have the kids and that she wants off paper." The court determined that "[n]one of the children express a wish to be living with their mother at this point. They all seem to have an understanding, at least on a basic level, of her inability right now to provide a home for them like the homes that they all enjoy at the current time." Therefore, the court found it was in I.S.'s, R.M.'s, Tomi. J.'s, and Toma. J.'s best interest to terminate respondent's parental rights.

¶ 42     This appeal followed.

¶ 43                        II. ANALYSIS

¶ 44     On appeal, appellate counsel argues this case presents no potentially meritorious issues for review. We agree, grant appellate counsel's motion to withdraw, and affirm the trial court's judgment.

¶ 45                        A. Fitness Finding

¶ 46     For purposes of evaluating whether there exists arguable merit to claims that respondent could raise on appeal regarding her fitness, we must bear in mind that any one ground, properly proved, is sufficient to affirm. *In re Janine M.A.*, 342 Ill. App. 3d 1041, 1049, 796 N.E.2d 1175, 1181-82 (2003). Further, a trial court's unfitness finding will not be disturbed on review unless contrary to the manifest weight of the evidence, meaning unless the opposite conclusion is clearly evident or the finding is not based on the evidence. See *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 516-17 (2005); *Janine M.A.*, 342 Ill. App. 3d at 1049. As such, we agree there would be no arguable merit to a challenge to the court's finding of unfitness

- 12 -

because, at a minimum, the court's finding respondent failed to make reasonable progress toward the return of I.S., R.M., Tomi. J., and Toma. J. during the nine-month period between August 10, 2018, and May 10, 2019, is not contrary to the manifest weight of the evidence.

¶ 47 The question of reasonable progress is an objective one, which requires the trial court to consider whether respondent's actions would support the court's decision to return the child home in the near future. See *In re Phoenix F.*, 2016 IL App (2d) 150431, ¶ 7, 51 N.E.3d 1020. In order for there to be reasonable progress, there must be some "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re C.N.*, 196 Ill. 2d 181, 211, 752 N.E.2d 1030, 1047 (2001).

¶ 48 Here, the evidence reflected, and the trial court reasonably found, that at the end of the nine-month period, respondent had "largely walked away from any meaningful investment in making the kind of progress that she would have to make to correct the problems and create a situation where the children could be returned to her in the near future." Respondent's service plan included mental-health counseling, parenting classes, and a psychological evaluation. While the parenting education group final report showed respondent participated in a 12-week parenting course in October 2018, respondent failed to complete other recommended services. Nelson testified respondent started a domestic violence class but by June 2019 stopped attending the class. Caseworkers Welch and Lollar both testified that respondent never completed counseling services through Cognition Works.

¶ 49 Respondent received methadone treatments at Rosecrance. Respondent also attended occasional urine drops where she tested positive in January 2019, February 2019, and March 2019 for substances other than methadone.

¶ 50　　　　Initially, respondent engaged in supervised visitation with her children once per week for two hours in the community. However, multiple caseworkers testified to the chaotic nature of the visits. Ultimately, caseworker Lollar suspended visits in the beginning of April 2019, and she testified that she never expanded visitation because respondent "wasn't consistent." Lollar testified that respondent failed to attend or cancelled visits in the six weeks prior to April 3, 2019. Both Welch and Lollar testified they had issues contacting respondent. Specifically, Lollar testified that in February 2019, respondent failed to maintain contact, and in March 2019, respondent's whereabouts were unknown. Respondent last visited I.S., R.M., Tomi. J., and Toma. J. in April 2019 and respondent failed to maintain contact with LSSI after April 2019.

¶ 51　　　　In light of the foregoing, the trial court's finding was not contrary to the manifest weight of the evidence. That is, the State met its burden of establishing that between August 10, 2018, and May 10, 2019, respondent made no reasonable progress toward the possibility that the court in the near future would be able to order I.S., R.M., Tomi. J., and Toma. J. returned to respondent. See *In re Jordan V.*, 347 Ill. App. 3d 1057, 1068, 808 N.E.2d 596, 605 (2004).

¶ 52　　　　　　　　　　　　B. Best-Interest Finding

¶ 53　　　　Similarly, we conclude there is no arguable merit to a claim it was against the manifest weight of the evidence for the trial court to conclude that termination of parental rights is in I.S.'s, R.M.'s, Tomi. J.'s, and Toma. J.'s best interests. See *In re Janira T.*, 368 Ill. App. 3d 883, 894, 859 N.E.2d 1046, 1055-56 (2006). A reviewing court will not disturb a trial court's best-interest determination unless it is against the manifest weight of the evidence. *S.M.*, 314 Ill. App. 3d at 687. In making a best-interest determination, the trial court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West

2018)), including the child's physical safety and welfare, including food and health; need for permanence, stability, and continuity; sense of attachment, love, security, and familiarity; community ties; and the uniqueness of every child. 705 ILCS 405/1-3(4.05) (West 2018).

¶ 54    Here, the trial court considered best-interest reports of LSSI and CASA, both of which recommended termination of parental rights. Both reports asserted all four children remained in relative foster care and were doing well. Tomi. J. and Toma. J. both appeared to exhibit a different attitude and demeanor since placement with their current foster parents. While I.S. and R.M. did not fully understand all that was happening in the case, both CASA and LSSI found they appeared to be thriving in their foster placements and they both expressed a desire to remain in their current home forever.

¶ 55    Respondent failed to maintain a stable residence and often resided with family and friends. Respondent had not engaged in visitation or maintained contact with LSSI since April 2019. Respondent also failed to participate in all the recommended services and tested positive for drugs at multiple drug drops. Further, respondent expressed a desire to discontinue involvement with DCFS where she stated, "[s]he didn't want anything to do with this anymore, that who had the kids she wants to have—have the kids and that she wants off paper."

¶ 56    In looking at the evidence in conjunction with the statutory factors, the trial court found it was in I.S.'s, R.M.'s, Tomi. J.'s, and Toma. J.'s best interests to terminate respondent's parental rights. Given the foregoing, the court's finding terminating respondent's parental rights was not contrary to the manifest weight of the evidence.

¶ 57                          C. Motion to Withdraw

¶ 58    In *S.M.*, 314 Ill. App. 3d at 685-86, this court set forth the proper procedure for appellate counsel's request to withdraw based on an *Anders* motion in parental rights termination

- 15 -

cases.  First, we required counsel to set out any irregularities or potential errors in a brief that may arguably be meritorious in his client's judgment.  *Id.* at 685.  Second, we required counsel to sketch the argument in support of these issues that could be raised and explain why he believed they are frivolous *if* such issues are identified.  *Id.* (In *In re Austin C.*, 353 Ill. App. 3d 942, 946, 823 N.E.2d 981, 984 (2004), we clarified this statement by changing "if" in the above statement to "as to any such issue identified," requiring counsel to identify, argue, and explain the frivolity of all potential issues.)  Third, we required counsel to conclude the case presented no viable grounds for appeal.  *Id.*  Fourth, we required counsel to include the transcripts of the fitness and best-interest hearings.  *Id.*

¶ 59        After examining the record, the motion to withdraw, and appellate counsel's brief, we agree with counsel that this appeal presents no issues of arguable merit.  Counsel's motion and brief sufficiently comply with the above procedures.  We therefore grant counsel's motion to withdraw and affirm the judgment of the trial court.

¶ 60                              III. CONCLUSION

¶ 61        For the reasons stated, we affirm the trial court's judgment.

¶ 62        Affirmed.