2023 IL App (2d) 230217-U
No. 2-23-0217
Order filed December 28, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* L.B., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | No. 20-JA-153 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Kathryn D. Karayannis, |
| Appellee, v. Jenna E., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Birkett and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: We grant appellate counsel's motion to withdraw and affirm the trial court's judgment terminating respondent's parental rights, concluding that there exist no issues of arguable merit to be raised on appeal.

¶ 2    Respondent, Jenna E., appeals from the trial court's order finding her unfit to parent her child, L.B. (born January 5, 2015), and terminating her parental rights.[1] Her appellate counsel has moved to withdraw under *Anders v. California*, 386 U.S. 738 (1967), stating that he has read the

_____

[1]The parental rights of L.B.'s father, William Gregory B., are not at issue in this appeal, as he is deceased.

record and concluded there exist no issues of arguable merit to be raised on appeal. See *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000) (holding *Anders* applies to cases involving termination of parental rights). Counsel has supported his motion with a memorandum of law providing a statement of facts, potential issues, and argument as to why those issues lack arguable merit. See *In re Alexa J.*, 345 Ill. App. 3d 985, 988 (2003) (further holding that "counsel must identify at least one potentially justiciable issue in a motion to withdraw under *Anders*."). Counsel served respondent with a copy of the motion and memorandum. We advised respondent that she had 30 days to respond to counsel's motion. That time has passed, and no response was filed. We conclude that this appeal lacks arguable merit based on the reasons set forth in counsel's memorandum. Therefore, we grant counsel's motion and affirm the trial court's judgment.

¶ 3 We note that this appeal was accelerated under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Pursuant to that rule, the appellate court must, except for good cause shown, issue its decision in an accelerated case within 150 days of the filing of the notice of appeal. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, respondent filed her notice of appeal on June 28, 2023. Respondent's first counsel filed his motion to withdraw on August 24, 2023, and respondent was given 30 days to respond; no response was filed. On October 18, 2023, this court struck counsel's motion, as counsel had not complied with the procedure laid out in *Alexa J.*, and we discharged counsel and remanded the case for the limited purpose of appointment of other counsel. On October 20, 2018, we denied discharged counsel's motion to reconsider. The trial court appointed new counsel, and, on November 22, 2023, counsel moved to withdraw under *Anders*. Due to these circumstances, we find good cause for this decision to be issued after the timeframe mandated by Rule 311(a).

¶ 4 I. BACKGROUND

¶ 5    On October 5, 2020, the State petitioned for a finding that L.B. was a neglected minor due to his environment being injurious to his welfare, in that respondent's mental health issues placed him at risk of harm.  Respondent has bipolar type 1 disorder and schizoaffective disorder.  The Department of Child and Family Services (DCFS) responded to a call on August 22, 2020, concerning L.B.'s well-being after respondent was allegedly being aggressive toward her father in the child's presence and being verbally aggressive toward L.B.  Respondent had been in a manic state for several months, refusing to take her medication for bipolar disorder.  She was hospitalized for 10 days in September 2020 and signed herself out against her caregivers' recommendations (allegedly based on insurance issues) on September 23, 2020.  After release, she allegedly made suicidal statements and threatened L.B. with physical harm.  DCFS implemented an in-home safety plan with the maternal grandparents, with whom respondent and L.B. resided. On October 2, 2020, respondent became combative and refused to sign the safety plan.  DCFS took protective custody of L.B. on that date, and he was placed in his paternal grandparents' home.  DCFS was granted temporary custody of L.B. on October 6, 2020.

¶ 6    Tiffany Fabian, a DCFS investigator, testified that respondent had been physically and verbally aggressive with her father in L.B.'s presence, called L.B. names ("dumb shit" and "piece of garbage"), and had threatened to put him in the ground.  She also claimed that she was not bipolar or mentally ill and had ADHD.  A psychiatrist at the hospital indicated that respondent was delusional and paranoid.  After DCFS took protective custody of L.B., respondent sent Fabian 75 text messages.  The trial court found that there was probable cause for the petition to proceed, granted DCFS temporary custody of L.B., and appointed CASA as guardian *ad litem*.

¶ 7    The adjudicatory hearing was held on April 8, 2021.  Fabian testified as to how L.B. came into care and related that a psychiatrist at Hartgrove Hospital had advised that L.B. should not

remain in respondent's care if she failed to maintain her medication regime. During the course of Fabian's investigation, she learned that respondent was not medication compliant. She spoke to respondent on October 2, 2020, at the grandparents' home in Carpentersville, and respondent appeared very disheveled and was paranoid, refused to sign the safety plan (she initially signed the plan but she was required to sign again every five days), and stated she was moving and taking L.B. with her. She was also verbally mean toward L.B. and, when he asked for a hug, she told him to stay six feet away from her due to COVID-19. DCFS took protective custody of L.B.

¶ 8     Fabian also testified about the text messages respondent sent her. She related that respondent was aggressive and attacked Fabian in the messages. She also stated she did not have bipolar disorder and that L.B. had issues that she was trying to fix. Respondent also accused L.B. of being verbally and physically aggressive toward her and calling her vulgar names. She also stated that L.B. was not her child.

¶ 9     Respondent testified that she appeared disheveled the day Fabian visited because she was getting ready for the gym. She stated that she had taken L.B. to the police station because he was verbally aggressive with her and had punched her in the face. Respondent also claimed that Fabian took L.B. and drove off without him being fastened in a car seat. Respondent denied being verbally abusive toward L.B.

¶ 10    The trial court found that L.B. was a neglected minor. At the May 7, 2021, dispositional hearing, the court noted it had reviewed DCFS's family service plan (dated April 20, 2021), and the integrated assessment (dated February 8, 2021), and a CASA report. The court found that L.B. should be made a ward of the court. It determined that respondent was not fit or able to care for her son and needed to complete services, including: a mental health assessment and recommended

treatments (random drug tests, substance abuse evaluation, parenting education, participation in visitation, and medication compliance). The court set the goal to return home within 12 months.

¶ 11 Permanency review hearings on October 4, 2021, and April 4, 2022, reflected that respondent had been participating in services and making progress; however, the court was awaiting written reports and a neuropsychological evaluation.

¶ 12 At an October 3, 2022, permanency review hearing, the trial court acknowledged that respondent had made reasonable efforts and progress but that the parenting capacity assessment was required to be completed and that she needed to show she was substance free for six months prior in order for the assessment to be conducted. Respondent had three months of clean drug tests. A June 10, 2022, missed drug test was considered positive. She had clean tests in July and August 2022. The court found that respondent was attending psychiatrist appointments and individual therapy and that she was medication compliant. She had been consistently visiting L.B. Respondent had also completed a substance abuse evaluation, and no recommendations were made for further treatment; however, the court wanted to see the evaluation.

¶ 13 At an April 21, 2023, permanency review hearing, Kiya Murphy, a Lutheran Child and Family Services LCFS) caseworker, noted that respondent had engaged in inappropriate name calling of her and, during the prior week, had posted her personal information on social media. Murphy had also recently learned that respondent was not seeing her psychiatrist because the doctor no longer accepted Medicaid. The parenting capacity assessment had been scheduled for mid-May. Murphy also reported that respondent had not resumed services and had stopped participating in individual therapy at 7 Hills Behavioral Center. She was also not medication compliant. The trial court found that the appropriate goal was substitute care pending determination of a petition to terminate parental rights. L.B., the court noted, had been in care for

2½ years, was well cared for at his paternal grandparents' house, and deserved to have permanency. Reports indicated that L.B. reported that, during visitations, respondent did not interact with him much. Respondent's lack of participation in individual therapy was not dependent on finances. As of the last court date, the court noted, respondent had been on "texting binges," texting the caseworker (and not always about the case). The trial court also noted that respondent had not been attending visitations since the beginning of April, because they had been suspended due to the significant mental health concerns reported by her psychiatrist. The court also found that the delay in the parenting capacity assessment was partially based on respondent's use of THC. It further noted that inpatient care had been recommended. The court found that respondent had made efforts but not made reasonable or substantial progress to the return home of L.B.

¶ 14   On May 8, 2023, the State petitioned to terminate respondent's parental rights, alleging that respondent was unfit in that she had failed to: (1) maintain a reasonable degree of interest, concern, or responsibility as to L.B.'s welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) protect L.B. from conditions within his environment injurious to his welfare (750 ILCS 50/1(D)(g) (West 2022)); (3) make reasonable efforts to correct the conditions which were the basis for the removal of L.B. from her during the nine-month period between April 9, 2021, and January 9, 2022, after an adjudication of neglected, abused, or dependent minor (750 ILCS 50/1(D)(m)(i) (West 2022)); (4) make reasonable progress toward the return of L.B. to her during the nine-month period from April 9, 2021, through January 9, 2022, after an adjudication of neglected, abused, or dependent minor (750 ILCS 50/1(D)(m)(ii) (West 2022)); (5) make reasonable efforts to correct the conditions which were the basis for the removal of L.B. from her during the nine-month period between January 10, 2022, and October 10, 2022, after an adjudication of neglected, abused, or

dependent minor (750 ILCS 50/1(D)(m)(i) (West 2022)); and (6) make reasonable progress toward the return of L.B. to her during the nine-month period from January 10, 2022, through October 10, 2022, after an adjudication of neglected, abused, or dependent minor (750 ILCS 50/1(D)(m)(ii) (West 2022)).  The State also argued that it was in L.B.'s best interests that respondent's parental rights be permanently terminated and that DCFS remain legal guardian with power to consent to his adoption.

¶ 15                    A. Fitness Hearing

¶ 16    On June 15, 2023, a hearing was held on the State's petition.  Veronica Michalski, a caseworker at LCFS who was assigned to L.B.'s case between October 2020 and December 2022, testified that L.B. came into care because respondent was aggressive toward her father and sometimes verbally abusive toward L.B.  She had made threats against L.B. that she was going to bury him.  After an integrated assessment, it was recommended that respondent undergo a psychiatric assessment, medication assessment (and be medication compliant), counseling, a parenting class, substance abuse assessment, and periodic drug tests.  Michalski testified that, during the latter part of her tenure, respondent was seeing a psychiatrist and taking her prescribed medications.  Respondent also consistently saw her therapist at 7 Hills, but progress was "extremely slow and difficult," because respondent did not understand why she was required to be in counseling.  Also, respondent never moved to unsupervised visits, nor did she undergo a recommended parenting capacity assessment.  DCFS required that respondent be drug-free (other than prescribed medications) for at least six months.  Respondent submitted to random drug tests, and, initially, for several months, she tested positive for THC in January, March, and April 2022 (which delayed the parenting capacity assessment).  She also tested positive for cocaine in March 2022.  Toward the end of Michalski's tenure, however, respondent was testing negative.

Respondent completed a substance abuse assessment and did not qualify for services. She was referred for a parenting class and successfully completed it.

¶ 17    Addressing visitations, Michalski testified that the visits were weekly, initially on Zoom. In March 2022, due to a job change, visits were supervised by respondent's parents on weekends. Respondent's conduct during the visits was initially very good, but she did not speak much to L.B. L.B. initiated conversations. Once the visits moved to in-person, they occurred in parks or the library. Respondent became less "stiff" and she brought craft projects, toys, etc. She regularly communicated with Michalski, but did not inquire about L.B. During the time Michalski was respondent's caseworker, respondent lived with her parents and had about six or eight jobs, as she frequently switched employment. When Michalski retired, respondent had not been discharged from her therapy.

¶ 18    While respondent was in therapy, according to Michalski, she did not understand why she was required to be in counseling and her insight was limited. However, she consistently attended.

¶ 19    Kiya Murphy, a child welfare specialist at LCFS, succeeded Michalski as the caseworker in December 2022. At that time, respondent's visits were being supervised by her parents. For various reasons, Murphy never supervised them. Respondent was seeing a psychiatrist and a therapist. Murphy sent respondent for random drug tests, and respondent missed four tests. She did not have any positive tests during Murphy's tenure. A parenting capacity assessment was scheduled for May 1, 2023, but respondent left before the interviews started, thus, the assessment was never completed.

¶ 20    During Murphy's tenure, respondent consistently visited L.B., but, in April 2023, her visits were suspended because the agency received reports from L.B. about respondent not interacting with him and arguing with her parents during visitations. Also, the agency received information

from respondent's psychiatrist and therapist that they were very concerned for her well-being and that she was not attending appointments. Further, respondent was not medication compliant at this time. The psychiatrist recommended inpatient hospitalization.

¶ 21 Murphy also learned that respondent's boyfriend attended visits with her. This was concerning because Murphy did not know anything about the boyfriend and the agency had not conducted a background check on him. Further, in April 2023, Murphy learned about two social media posts by respondent wherein she used Murphy's full name and employer and called Murphy a "disrespectful snot." Murphy also related that, beginning in January 2023, respondent began excessively texting her. She asked respondent to stop, but it continued. The texting was acknowledged at a February 2023 court date, but it got worse afterwards and included "random bizarre messages." Respondent's client service plan included a provision to refrain from excessive texting.

¶ 22 Respondent was rated as unsatisfactory in her April 2023 client service plan, because she was not complying with services and her visits had been suspended. During Murphy's tenure, respondent never successfully met her treatment goals. Nor was she successfully discharged from therapy.

¶ 23 In May 2023, Murphy received multiple text messages from respondent. One text included a YouTube video of a song with lyrics that were concerning; one about being taken away in a hearse and another about being cut up. Following the text, the foster mother (*i.e.*, paternal grandmother) obtained an order of protection for her, her husband, and L.B. against respondent.

¶ 24 On cross-examination, Murphy testified that, when she took over the case, respondent was participating in services at 7 Hills, visitations, and was medication compliant.

¶ 25    Jennifer B., L.B.'s foster mother and his paternal grandmother, testified that respondent used to date her son. In March 2023, when L.B. returned home from his visits with respondent, he was upset on two occasions. On the first occasion, he cried and stated that respondent had left the visit early. The second time, he was upset and stated that his mother was not right and that respondent had argued with her parents. Jennifer also testified that, between December 2022 and May 2023, she received about 150 texts from respondent; only three or four texts asked about L.B. Jennifer did not respond because some of the messages were "off." She reached out to the caseworker and respondent's parents.

¶ 26    The trial court found that the State had proven the allegations in each of the counts of its petition, excluding the third and fifth counts relating to reasonable efforts. It found the witnesses credible and determined that respondent did not comply with recommendations to stay hospitalized and medication compliant. Addressing visitations, the court found that respondent left visits early and did not inquire about L.B. The court also determined that respondent had tested positive for THC and cocaine despite being informed that she could not use those substances while on other medication and while completing services. She also failed to participate in the parenting capacity assessment. The court determined that the unrebutted testimony established that respondent made "very slow" progress at times. Evidence relating to her individual therapy showed that she did not understand why DCFS was involved or how her behavior affected this case. The court also noted that respondent's visitations never moved to being unsupervised over the 2½-year pendency of the case. It also noted her excessive texting. Also, during visits with her parents, she argued, left early, and upset L.B. She also texted about a song lyric relating to a hearse and cutting someone up. Respondent had also been recommended for inpatient treatment but had not attended and had stopped seeing her psychiatrist and individual therapist.

¶ 27                               B. Best Interests Hearing

¶ 28     At the best interests hearing, Murphy testified that L.B. has been placed with his paternal grandparents since October 2020.  She visits twice per month, and the home is nice and large, and L.B. has many toys.  He appears to have a strong bond with his grandparents and does well in school.   His grandparents take him to activities, such as movies, camping in the backyard, or picnics.  He also interacts with extended family.

¶ 29     The home is pre-adoptive.  The grandparents have been supportive of individual therapy, and they are currently meeting all of L.B.'s needs.  Murphy opined that L.B. deserves a permanent home with grandparents.  They are willing to permit safe and appropriate contact with respondent and her side of the family.

¶ 30     The trial court found that it was in L.B.'s best interests that respondent's parental rights be terminated.  The relevant factors all favored this, the court determined, and L.B. was being well cared for by his paternal grandparents, he loves them, and, per a therapist's report, prefers remaining in their care.

¶ 31     Respondent appealed.  The trial court appointed counsel to represent respondent on appeal. As noted, appellate counsel has moved to withdraw, in accordance with *Anders*.

¶ 32                               II. ANALYSIS

¶ 33     In his *Anders* motion, counsel argues that there may be an argument to be made that the State failed to establish that respondent failed to make reasonable progress toward the return home of L.B. during the nine-month period from April 9, 2021, through January 9, 2022, but that no such argument can be made for the remaining three grounds upon which the trial court found respondent unfit, evidence for which was overwhelming, or its best interests determination, and, thus, an appeal on this basis would be frivolous and without merit.

¶ 34    The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) sets forth a two-stage process for the involuntary termination of parental rights. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. Initially, the State has the burden of proving by clear and convincing evidence that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). 705 ILCS 405/2-29(2), (4) (West 2022); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interests. 705 ILCS 405/2-29(2) (West 2022); *In re D.T.*, 212 Ill. 2d 347, 367 (2004). On appeal, this court will not disturb a trial court's finding as to parental unfitness or a child's best interests unless it is against the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence where the decision is unreasonable. *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 35    Furthermore, it is well settled that, "when parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court." *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004). Hence, if we affirm the trial court's decision on one ground, we need not consider the court's decision on the other grounds. After careful review, we agree that there would be no arguable merit to a challenge to the court's finding of unfitness because, at a minimum, the court's finding that respondent failed to make reasonable progress toward reunification during the nine-month period January 10, 2022, through October 10, 2022, is not contrary to the manifest weight of the evidence.

¶ 36    The question of reasonable progress is an objective one, which requires the trial court to consider whether a parent's actions during a given nine-month period would support the court's

decision to return the child home soon. *In re Phoenix F.*, 2016 IL App (2d) 150431, ¶ 7. The court will consider the parent's compliance with the service plans and the court's directives. *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). For there to be reasonable progress, there must be, at a minimum, some measurable or demonstrable movement toward the goal of reunification. *In re J.O.*, 2021 IL App (3d) 210248, ¶ 57.

¶ 37    We agree with counsel that the potential issue he identifies lacks arguable merit. Because any single ground properly proven may support an unfitness finding (*Tiffany M.*, 353 Ill. App. 3d at 891), whether respondent made progress toward reunification in the nine-month period from April 9, 2021, to January 9, 2022, does not diminish or outweigh her failure to make reasonable progress during the period from January 10, 2022, through October 10, 2022.[2] The record amply supports the trial court's determination that respondent failed to make reasonable progress during the latter period. She attended individual therapy during this period, but, as her therapist noted, she did not demonstrate an understanding of the risk factors that contributed to DCFS's involvement. Similarly, Michalski testified that respondent's progress with her psychiatric therapy was "extremely slow and difficult" because respondent did not understand why she was required to be in counseling. Also, four out of eight drug tests were considered positive, one of which (March 2022) was positive for cocaine and three of which (January, March, and April 2022) were positive for THC; also, respondent failed to appear for a June 2022 drug test. The positive tests delayed her ability to engage in the parenting capacity assessment, which was a required service

---

[2]Although the record reflects that respondent's compliance with services deteriorated after this period, we do not address it because the State's petition did not include allegations for the period after October 2022.

toward the goal of reunification. Also, Michelski testified that, as of late 2022, respondent had not been successfully discharged from therapy. Although respondent was consistent with visitations, she never moved to unsupervised visits. A September 27, 2022, service plan noted that respondent listened to L.B., but that L.B. carried conversations and respondent did not respond much and merely repeated what L.B. stated. Also, when she communicated with Michalski, she did not inquire about L.B.

¶ 38    As to the best interests finding, the trial court found that L.B. has bonded with his grandparents (who meet his needs), does well in school, participates in activities, and interacts with his extended family.

¶ 39    Based on the foregoing, we cannot conclude that the trial court's fitness finding was against the manifest weight of the evidence. Thus, we agree with counsel that no viable argument challenging the court's finding could be raised. We also agree that no viable argument can be raised concerning the court's best interests determination.

¶ 40                                  III. CONCLUSION

¶ 41    After examining the record, the motion to withdraw, and the supporting memorandum of law, we agree with appellate counsel that respondent's appeal presents no issues of arguable merit. Thus, we grant the motion to withdraw and affirm the judgment of the circuit court of Kane County.

¶ 42    Motion granted; affirmed.