2026 IL App (2d) 250413-U
Nos. 2-25-0413 & 2-25-0426 cons.
Order filed February 17, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

In re L.B., a Minor

(The People of the State of Illinois, Petitioner-Appellee, v. Bruce B., Respondent-Appellant).

Appeal from the Circuit Court of Kane County.
Honorable Kathryn D. Karayannis, Judge, Presiding.
No. 23-JA-164

In re L.B., a Minor

(The People of the State of Illinois, Petitioner-Appellee, v. Mary E., Respondent-Appellant).

Appeal from the Circuit Court of Kane County.
Honorable Kathryn D. Karayannis, Judge, Presiding.
No. 23-JA-164

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: In these consolidated appeals, appellate counsels' motions for leave to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and *In re Alexa J.*, 345 Ill. App. 3d 985 (2003), is granted, and the circuit court's orders terminating respondents' parental rights are affirmed, where the record contains no issue of arguable merit to challenge the judgments.

¶ 2    Respondents, Bruce B. and Mary E., separately appeal from orders entered by the circuit court of Kane County finding them unfit to parent their biological child, L.B., and terminating their parental rights. Respondents were provided with appointed counsel, but counsel for both respondents have filed motions to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and *In re Alexa J.*, 345 Ill. App. 3d 985 (2003). On our own motion, we consolidate the appeals for decision. In their respective motions, counsel each assert that they thoroughly reviewed the record, governing statutes, and case law, and concluded that there are no non-frivolous issues that could be raised on appeal on behalf of their client. The record shows that Bruce's counsel sent a copy of his motion to Bruce's last known address by regular and certified mail as well as emailed the motion to him. Counsel states that his mailing to Bruce was returned marked "unclaimed, unable to forward." Indeed, counsel states that Bruce failed to establish any contact with him during the appeal, despite counsel sending correspondence to both the physical and email addresses Bruce provided in his notice of appeal. Mary's counsel likewise indicates that she mailed a copy of her motion to Mary's last known address, postage prepaid. We advised respondents that they had 30 days to file a response as to why their counsel's motion should not be granted and the court should not, after a proper review of the record, affirm the judgment. More than 30 days have passed since, and neither respondent has filed a response. We grant both motions to withdraw and affirm the judgments.

¶ 3                              I. BACKGROUND

¶ 4    On October 26, 2023, the State filed a petition for adjudication of wardship regarding L.B., then age 7, alleging she was a neglected minor pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2022)), in that her environment was injurious to

her welfare because Mary's untreated mental-health issues placed L.B. at risk, and Bruce failed to protect L.B. from the effects of Mary's mental illness.

¶ 5    The trial court held a shelter care hearing the following day, which was conducted over Zoom, a video conferencing platform. Mary and Bruce each appeared and declined representation by the public defender's office. Regina Bucknor, a child welfare specialist with the Illinois Department of Children and Family Services (DCFS), testified that she investigated a recent incident in which Mary, accompanied by L.B., went to the Elgin police department while exhibiting paranoid and delusional behavior, including expressing a belief that she was being spied on through her phone. Bucknor and two Elgin police officers visited Mary's residence due to the behavior, which was described as "aggressive." One of Mary's adult children let them into the residence, but when Mary appeared, she shouted for them to leave. Bucknor described Mary as "very aggressive," stating that Mary would not stop talking and would not allow anyone else to speak. They left without being permitted to speak with L.B. or assess her safety. Bucknor further testified that she also visited L.B.'s elementary school and met with the school's social worker, who explained that L.B. had not attended school at all during that school year. The social worker reported that Mary had brought L.B. to school on two occasions but would not allow her to enter the classroom and instead requested that she receive her education in the front office. A truancy case was pending but had not been successful. Bucknor also testified regarding a 2019 indicated report in which Mary was intoxicated and passed out in a restaurant restroom while L.B. and another child waited outside in a vehicle. Bucknor opined that L.B. would be at risk of harm if she remained in the home.

¶ 6    Mary cross-examined Bucknor and then offered her own direct testimony. Mary conceded that she believed someone was listening to her phone conversations and had placed tracking

devices "in parental set-ups," but she did not know who. She believed L.B.'s school district was involved and that someone was remotely controlling her devices and stalking her, and that this had been going on for three years. For those reasons, she would not allow L.B. to use her school-issued Chromebook because "of the malicious stuff going [on]," and she believed someone was "merging [L.B.'s] information with [hers]." Mary testified that L.B. had not attended school that year because L.B. "has some kind of extreme anxiety," which was being explored with L.B.'s counselor at the Ecker Center for Behavioral Health in Elgin. Mary denied she was trying to harm L.B. and stated that L.B. was "giving [her] a hard time" and was difficult to parent. Bruce's participation in the shelter care hearing was minimal.

¶ 7    The circuit court found probable cause for the filing of the petition, found that there was an immediate and urgent necessity to remove L.B. from the home, and granted temporary custody to DCFS, with visitation left to DCFS's discretion. In explaining its ruling, the court emphasized that no one had accused Mary of intentionally trying to harm L.B., but expressed "very significant concern" for L.B., noting that she should be attending school and that DCFS needed to ensure L.B.'s safety. The court cited L.B.'s total absence from school, Mary's attempt to file a police report alleging that the school district was tracking and stalking her through her phone, and Mary's refusal to allow DCFS to speak with L.B. during the home visit as its basis for concern regarding L.B.'s safety. Mary interrupted the court several times during the announcement of its ruling, including by using profanities, denying that she was delusional, and accusing the court system of being dishonest and "full of garbage." The court stressed the importance of cooperating with DCFS and complying with the terms of the service plans, advised both parents to seek counsel, and warned that failure to address the reasons L.B. was in care could result in the involuntary termination of their parental rights.

¶ 8     On November 15, 2023, the State filed an amended petition for adjudication of wardship alleging, as an additional ground, that L.B. was a neglected minor within the meaning of section 2-3(1)(a) of the Act (705 ILCS 405/2-3(1)(a) (West 2022)), in that she was not receiving proper or necessary education as required by law because she had not attended school during the 2023-2024 school year.

¶ 9     On December 29, 2023, the court conducted a pretrial conference at which both parents appeared via Zoom. An attorney initially appeared on behalf of both parents, but a potential conflict of interest was identified, prompting the court to require Bruce to secure separate legal counsel. Bruce testified regarding his financial hardship, and the court found him indigent and appointed the public defender to represent him.

¶ 10     On January 29, 2024, both parents appeared via Zoom on a shared device. Mary voiced dissatisfaction with her retained counsel and, after financial review, the court appointed conflict counsel to represent her going forward. The court continued the matter for an adjudicatory hearing to allow Mary to confer with her new counsel and advised the parents that, if they wished to appear via Zoom in the future, they needed to appear from separate locations and on separate devices to ensure confidential communication with their attorneys. Mary advised that she had neither a phone number nor email address, but that she would advise the court once she had those set up. The court instructed Mary to maintain regular contact with her appointed counsel. Bruce's role in the proceedings was again minimal but noted by the court.

¶ 11     Following an adjudicatory hearing on March 21, 2024, the court found that L.B. was a neglected minor because she suffered from a lack of support, education, or remedial care as defined by section 2-3(1)(a) of the Act, and because her environment was injurious to her welfare, as defined in section 2-3(1)(b). The finding was expressly based on the parents' stipulations that, if

the matter proceeded to a full hearing, the State would present evidence that Mary's undiagnosed mental health issues placed L.B. at risk of harm and that she was without the proper or necessary education as required by law. The court also noted that Mary persisted in her belief that L.B.'s school was monitoring and tracking her through her phone, and that L.B. had not attended school during the 2023-2024 school year until she was taken into protective custody. The court additionally found that both parents failed to protect L.B. from conditions within her environment injurious to her welfare. The court again admonished the parents to cooperate with DCFS and comply with the terms of the service plan to correct the conditions that required L.B. to be in care or risk termination of their parental rights.

¶ 12    On April 29, 2024, the court entered a dispositional order finding that it was consistent with L.B.'s health, welfare, and safety, and in her best interest, to be made a ward of the court. The court found both parents unfit and unable, for reasons other than financial circumstances alone, "to care for, protect, train, educate, supervise or discipline [L.B.] and placement with [Mary was] contrary to the health, safety and best interests of the minor."

¶ 13    Both parents were advised that they were required to participate in the services identified in the integrated assessment, as well as any services later developed as the case progressed. Specifically, Mary was advised to submit to random drug testing, undergo a psychiatric evaluation and follow all recommendations, comply with prescribed medication, participate in individual counseling, adhere to the visitation plan, complete parenting education and, if recommended, complete parent coaching. She was further advised to maintain stable housing and income, cooperate with DCFS, and sign all necessary consents. Bruce was advised to submit to random drug testing, obtain a substance-abuse assessment and follow all recommendations, adhere to the visitation plan, participate in and successfully complete individual counseling, complete parenting

education, and, if recommended, complete parent coaching and family counseling. He was further advised to cooperate with DCFS, execute all necessary consents, and maintain stable housing and income. The court set the permanency goal as return home in 12 months. Mary objected strongly to the ruling, asserting that her rights were being violated, that her attorney was not adequately representing her, that DCFS and law enforcement were not being truthful, and that she would not take any prescribed medications because, "psychiatrists lie." The court denied her request for substitute counsel and advised her that, if she wished to discharge appointed counsel, she could either retain a private attorney or file a *pro se* appearance.

¶ 14 On July 29, 2024, the court held a status hearing to assess each parent's progress in completing the service plan. The court first observed that both parents had completed parenting education and then proceeded to assess each parent individually.

¶ 15 With respect to Bruce, the court found that he was making progress in cooperating with DCFS, noting that he had signed most of the required releases. He had attended the administrative case review and child and family team meetings; however, the court noted that he fell asleep during the latter meeting and encouraged him to participate more fully in future meetings. The court observed that Bruce was homeless but continued to seek housing. The court noted that Brighter Side Counseling had accepted Bruce for individual counseling, but that he had not completed the enrollment forms due to difficulty completing them online. The court instructed him to work with DCFS to resolve the issue or to visit the provider in person if online submission of the forms was not feasible. The court also noted that Bruce had been referred to Lutheran Social Services of Illinois (LSSI) for a substance abuse assessment, but that he had yet to follow up due to reported health issues, and he had failed to appear for at least two drug screens. He remained on a waitlist for parent coaching classes. DCFS case worker Stephanie Sanders reported that she had been

unable to secure a provider to complete a psychological evaluation because no providers had returned her calls. She advised the court that she would continue contacting providers every few days. The court also noted that Bruce's visits with L.B. had improved since the visits were moved from the library to Mary's home and encouraged him to "work on engaging more" with L.B. and to ask appropriate questions to ensure her wellbeing in her foster home.

¶ 16    Regarding Mary, the court noted that she had maintained her housing, cooperated with DCFS, and attended an administrative case review and child and family team meeting. She completed the intake forms for individual counseling with Brighter Side Counseling and began remote counseling sessions, but her initial session was unproductive due to technical difficulties. The court further noted that she had not completed a substance abuse assessment due to her failure to submit a list of collateral contacts, had failed to appear for one drug screen, and DCFS had not yet received the results of her most recent drug screen. The court explained that Mary's missed drug screen was deemed a positive result, but Mary disagreed, asserting that "these people [are] just doing anything to sabotage and make me look like I am not doing what I am suppose to do." The court noted that, if Mary were being sabotaged, she would not have had three negative drug screens. She remained on a waitlist for parent coaching services, and DCFS was searching for a provider to complete a psychological evaluation. The court also stated that it was encouraged by Mary's initiation of individual counseling and advised her to attend sessions in person if technical difficulties persisted. The court emphasized the importance of demonstrating significant progress in completing the service plans, warning that a failure to do so could result in a change in the case goal, including the possible termination of parental rights.

¶ 17    On October 29, 2024, at the first permanency hearing, trial court found that the services outlined in the service plan were appropriate and reasonably calculated to achieve the permanency

goal, and that those services had been provided, such that it was in L.B.'s best interest to remain in the custody and guardianship of DCFS. The court set the permanency goal as return home within 12 months.

¶ 18    The court first addressed Bruce and found that he had failed to make either reasonable efforts or substantial progress. Relying on a CASA report, the court observed that Bruce had not engaged in any recommended services and had not maintained regular contact with DCFS. Specifically, Bruce had failed to provide information regarding his housing, employment, or Social Security benefits, as well as information concerning his recommended services, including individual counseling, psychological and psychiatric evaluations, and a substance abuse evaluation. The court also noted that Bruce had failed to appear for multiple drug screens. The court acknowledged that Bruce had begun parent coaching, however, it had not yet received a progress report from the parent coach. The court also noted that Bruce's visits with the child were going well but admonished him to refrain from discussing the case with her. Bruce asserted that his health conditions, including heart disease and high blood pressure, made it difficult to complete his services. Sanders reported that DCFS had received a doctor's note advising that Bruce should avoid stress but emphasized that the note did not state he was unable to participate in services. The court acknowledged Bruce's health issues and stated that "every parent that's in this courtroom has stress," but emphasized the importance of taking "small steps" toward compliance with the service plan. Bruce questioned why he was "dragged in" to the case, noting that he was not L.B.'s custodial parent, that he paid child support, and that he exercised visitation. The court explained that, as L.B.'s father, he bore responsibility for her protection and that his failure to participate in services could have adverse consequences for his parental rights.

¶ 19 Regarding Mary, the court found that she had made reasonable efforts toward reunification but declined to make a finding on substantial progress due to insufficient information. The court noted that Mary had completed a psychological evaluation, was participating in in-person individual counseling, had completed parenting education, and had begun parent coaching. However, the court required progress reports from her counseling and parenting providers, as well as the psychological report. The court further noted that Mary had not yet completed a psychiatric evaluation and referenced her prior statements that she would refuse prescribed medication. The court advised that, while such refusal would be her choice, that decision "could affect how things proceed in the case." Mary had completed a substance abuse assessment with no recommended treatment and had participated in most drug screens, which were negative, though she failed to appear for one screen. The court noted that DCFS would refer Mary to Latino Treatment Center for future drug screens because she had been banned from Help at Home, where she was previously screened, due to aggressive and threatening behavior during a screening. The court also observed that Mary was "making good strides in her communication with the agency," but noted that she had recently been banned from the DCFS field office after making disrespectful comments during a child and family team meeting, which were characterized as verbally aggressive. Finally, the court noted that the visits with L.B. were "going well," and it reminded Mary not to discuss the case with her, noting that she had recently told L.B. that she would be coming home that day, which Mary denied.

¶ 20 At a status of services hearing on January 13, 2025, the court noted that it had received reports from CASA and DCFS, as well as psychological evaluation reports for both Mary and L.B. The court stated that Mary needed to execute additional releases so that DCFS could obtain additional records for L.B. to assist the psychological evaluator in making a diagnosis.

¶ 21    Regarding Mary's services, the court noted that she was participating in individual counseling and had completed parenting education and parent coaching through ROAN Solutions. However, DCFS had not received either a parent coaching discharge summary or a progress report from her therapist, which the court explained were necessary "to see if there are any other recommendations." The court also noted that Mary had completed the psychological evaluation. The court further noted that Mary was seen for a psychiatric evaluation at the Ecker Center, but the evaluator was unable to diagnose her or determine whether medication was appropriate because Mary provided vague answers during the evaluation and provided "no collaborative information," as Mary had not signed any of the required releases. Mary expressed frustration during the hearing and asserted that she had provided all necessary information and was being unfairly portrayed. She also asserted that the service providers were lying about her progress "to keep the situation going." The court acknowledged her efforts but emphasized the importance of signing the consent forms and providing all necessary documentation to the service providers.

¶ 22    Regarding Bruce, the court described his status report as "not great." The court noted that his visits with L.B. had been suspended due to his failure to complete a substance abuse assessment and submit to random drug screens. It further noted that Bruce had not started individual counseling and still needed to complete both a psychological evaluation and a psychiatric evaluation. Parent coaching remained on hold pending completion of a substance abuse assessment, and the court stated that "there's a lot of work that needs to be done."

¶ 23    The court further noted that the most recent visit report was "not good for either parent," observing that L.B. was often dysregulated following visits, which the court commented was "concerning." It also noted that the parents' conduct during visits had caused disruptions, resulting in multiple changes to the visitation location. Visits were initially held in Mary's home, then

moved to ROAN Solutions, but ROAN Solutions subsequently declined to host visits, and they were relocated to a local library. The court again emphasized the seriousness of the situation and the potential consequences if the parents failed to make progress toward reunification with L.B.

¶ 24 Following argument at a permanency hearing on April 7, 2025, and consistent with the requests of the State and CASA, the trial court changed the permanency goal to substitute care pending determination on termination of parental rights. In announcing its finding, the court advised that it had reviewed several documents in advance of the hearing, including reports from DCFS and CASA, a March 2025 quarterly progress report and individual treatment plan update prepared by Mary's therapist, a psychological evaluation for Mary, and an LSSI report regarding Bruce.

¶ 25 Regarding Mary, the court found that although she made reasonable efforts toward returning L.B. home, she had not made reasonable or substantial progress toward reunification due to her ongoing mental health issues and a lack of progress in counseling. In reaching this finding, the court was expressly persuaded by the parent-coaching discharge summary, the psychological evaluation, and the therapist's reports, all of which reflected that additional work was necessary. The court emphasized that the psychological evaluation recommended continued counseling and, although Mary consistently attended counseling and was at times engaged in discussion, she resisted deeper therapeutic work. The court pointed to the therapy notes, which reflected that whenever the therapist attempted to address the reasons the case came into care or the results of her psychological evaluation, Mary denied their validity and became defensive, which impeded meaningful progress in her treatment. The court further noted that Mary continued to state that she would refuse medication even if prescribed. The court also observed that Mary continued to have conflicts with service providers, which stemmed from mistrust, poor attitude, or paranoia,

and which resulted in her being banned from multiple providers. Mary also persisted in her belief that someone was tracking her and attempting to steal her information, which was a concern that initially brought the case into care. As the court announced its ruling, Mary interrupted the proceedings and accused the services providers of lying, and the court admonished her to stop interrupting or risk removal from the courtroom.

¶ 26 Regarding Bruce, the trial court found that he had made neither reasonable efforts nor reasonable and substantial progress toward returning L.B. home. The court emphasized that Bruce had failed to provide DCFS with proof of engagement in individual therapy, had not submitted documentation showing completion of a psychiatric evaluation, and had failed to appear for his psychological evaluation, resulting in the expiration of his referral. The court further noted that in February 2025, Bruce participated in a substance abuse assessment that recommended additional treatment, but he did not participate in the recommended services, and, in March 2025, he tested positive for alcohol and cocaine.

¶ 27 The court ordered that custody and guardianship of L.B. remain with DCFS, and it scheduled pretrial conference for August 4, 2025, and a termination hearing for September 8 and 11, 2025. The court stated that there was no doubt that the parents both loved their daughter, but that neither parent had shown sufficient progress to permit L.B.'s return in the near future. The court admonished the parents to remain in contact with their attorneys and emphasized the importance of preparing for trial. As the hearing concluded, Mary voiced her frustration with the court's decision, asserted that DCFS was lying and had unfairly portrayed her in a negative light, and proceeded to shout profanities and slam doors as she exited the courtroom escorted by court security. The court noted her conduct on the record, characterizing it as verbally abusive and inappropriate.

¶ 28     On April 29, 2025, the State filed a petition seeking to terminate Bruce and Mary's parental rights to L.B.  As to both parents, the petition alleged that they were unfit in that they each: (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failed to protect the minor from conditions within her environment injurious to her welfare (*id*. § 1(D)(g); (3) failed to make reasonable efforts to correct the conditions that were the basis for the minor's removal during the nine-month period from July 7, 2024, through April 7, 2025 (*id*. §§ 1(D)(m)(i), (ii)); and (4) failed to make reasonable progress toward the return of the minor during the nine-month period from March 22, 2024, through December 22, 2024, as well as from July 7, 2024, through April 7, 2025, following the adjudication of neglect (*id*. §1(D)(m)(ii)).  Additionally, the petition alleged that Bruce failed to make reasonable efforts to correct the conditions that were the basis for the child's removal during the nine-month period from March 22, 2024, through December 22, 2024, following the adjudication of neglect (*id*. §§ 1(D)(m)(i), (ii)).

¶ 29     On August 4, 2025, the parties appeared for pretrial conference, at which the court noted that Bruce failed to appear.  The State confirmed its intention to proceed on the petition for termination of parental rights and submitted its list of witnesses, exhibits, and requests for judicial notice.  On the motion of Bruce's counsel, and without objection, the court ordered that all parties and witnesses appear in person for the termination hearing.  Mary asserted that the case should be dismissed and complained that her attorney was not representing her adequately.  The court advised her that she could retain private counsel at her own expense or proceed *pro se*, but that it would neither appoint substitute counsel nor continue the trial to a later date.

¶ 30                              A.  Unfitness Hearing

¶ 31　　Trial commenced on September 8, 2025. At the State's request, the court took judicial notice of the temporary custody order entered October 27, 2023, the adjudicatory order entered March 21, 2024, the dispositional order entered April 29, 2024, and the orders entered following permanency review hearings on October 29, 2024, and April 7, 2025. The court also admitted into evidence, without objection, more than 20 exhibits offered by the State, including the integrated assessment, multiple service plans, and records from the various service providers.

¶ 32　　Mary testified that L.B. came into care due to what she described as a "fabricated situation," in which the State alleged that she was negligent, delusional, and suffered from mental health challenges. She asserted that she cooperated with DCFS and completed the services asked of her as outlined in the service plan despite believing those services were unnecessary.

¶ 33　　Mary testified that she underwent a psychiatric evaluation at the Ecker Center, which recommended mental health treatments, individual counseling, and medication. She did not agree with the recommendations and denied having any mental health issues. She asserted that the evaluation itself "was fabricated" because the evaluator, Dr. Usha Kartan, worked with DCFS, which she claimed was "trying to do whatever it takes to take my child." Mary acknowledged that the psychiatric evaluation recommended antipsychotic medication but denied her need for medication. She stated that "you all are forcing me to take something I do not need for a false accusation about me," and she did not "believe half of what you all are trying to tell me." Mary repeatedly stated that she intended to sue Dr. Kartan and her staff.

¶ 34　　Mary detailed several of the services she participated in or completed during her testimony, including an 8-week online parenting class and parent coaching. She testified that she participated in a substance abuse assessment at LSSI, which did not recommend any treatment. Mary also participated in individual counseling through Brighter Side Counseling but stopped attending after

DCFS informed her that it would no longer pay for the sessions because it did not believe she was deriving any benefit. She asserted that she would not pay for therapy herself because she did not believe she needed therapy.

¶ 35 Mary further testified that she participated in several observed drug screens at Help at Home but was banned from the premises after becoming upset when she was told she could not bring her purse into the bathroom during urine collection. She emphasized that an employee was required to observe her in the bathroom and asserted that an employee "made a big deal about something that shouldn't have been a big deal." Mary denied "being problematic" during the drug screen. She thereafter completed drug screenings at Latino Treatment Center in Elgin, and all the screenings were negative. Mary acknowledged missing one screening, which was deemed positive, and attributed the missed test to her phone not working properly and her failure to receive notice of the random screening. Mary conceded that she was also banned from a DCFS office, but she denied any wrongdoing. She asserted that the caseworker, Sanders, did so "because she didn't like the truth" and wanted to make Mary look bad.

¶ 36 Mary acknowledged that L.B. refused to attend school while she was in her care but asserted that L.B. was giving her a "hard time" and was stubborn. Mary testified that L.B.'s refusal to attend school was likely due to a trauma she experienced there, although Mary was unsure of the specific cause. She further testified that, at the time DCFS became involved, she had been taking L.B. to a counselor at the Ecker Center. Mary agreed that L.B. had recently been diagnosed with anxiety and testified that, if L.B. were returned to her care, she would obtain whatever services L.B. needed.

¶ 37 Mary further testified that she exercised visitation with L.B. once per week at the library for two hours each, where they would read and play together in the youth area. About four visits

occurred in Mary's home, but the location was later changed back to the library after Bruce asserted that the circumstances had caused L.B. to cry for two years, which Mary agreed with and attributed to the presence of case workers observing the visits. Mary agreed that visitation remained supervised throughout the case and that the schedule was never expanded.

¶ 38 Mary testified that she had lived in the same home in Elgin with her three adult children and L.B. for the past eight years. She was unemployed but paid for utilities, groceries, and similar expenses using her older daughter's SSI benefits, and supplemented that income by braiding hair. She further testified that she was actively seeking employment. She stated that she had attempted to look for work through Indeed.com but did not like the site because "they say Indeed is kidnapping people" and that "[s]ome people disappear apparently through that site." She further asserted that, if L.B. were returned to her care, she would financially support her through an expected financial settlement and through proceeds she anticipated receiving after "suing everybody who has done me wrong."

¶ 39 Julie Traskaski, a parent-support specialist with ROAN Solutions, testified that Mary and Bruce completed "Circle of Security," which is an 8-week parent-training program. Traskaski testified that the group met once per week on-line, and each session lasted between approximately one hour to 90 minutes.

¶ 40 Traskaski testified that Bruce made several statements during the classes that caused her concern. For example, she presented the group with a list of 20 traits indicating secure attachment in children and asked Bruce to identify which of those traits he observed in L.B. Bruce responded that there were "none." He explained that he is "more old-school" and stated that his children are either "wolves or sheep." Traskaski also asked Bruce how he would respond if his daughter came to him with a problem with a friend at school and how he would support her. Bruce stated that he

would tell her to "throw knuckles," which he explained meant to physically fight the other child. Traskaski and Bruce later discussed other, more appropriate alternatives. Traskaski further testified that, despite her encouragement to open up during the classes, Bruce remained "very quiet," did not ask many questions, and was frequently unable to give examples or self-reports. Bruce maintained that he was "actively listening," and Traskaski testified that Bruce completed all the assigned homework.

¶ 41 Traskaski testified that Mary was initially quiet but, if called upon, she "did engage" and was involved in the discussions. Some of the exchanges led Traskaski to believe that Mary understood some of the concepts they had worked on in the class, and Mary provided good examples of what they had been learning in the group. She agreed that Mary "was learning from [the] sessions."

¶ 42 Traskaski recommended that, despite completing parenting education, both parents continue with parenting education beyond the group. She cited Bruce's lack of engagement during the sessions and her belief that, although Mary completed the class, she was unable to meet L.B.'s emotional needs. She further testified that Mary would "definitely benefit" from additional, individualized parenting education, which was offered through ROAN Solutions. Traskaski testified that when she informed Mary of her recommendation for parent coaching, Mary was "not very happy to hear that" and became frustrated. Mary completed nine parent coaching sessions, but she was unsure if Bruce completed any.

¶ 43 Farrah Stephen, a mental health therapist at Brighter Side Counseling, testified that she was Mary's therapist for about five or six months beginning in December 2024 and continuing until April 2025, after the court changed the permanency goal and DCFS no longer covered the cost of Mary's services. She explained that, prior to that time, Mary had worked with a different therapist

at Brighter Side Counseling. Stephen described Mary as a "nice lady" who was generally "engaged" and who spoke of her love for L.B. and about her historical past. However, whenever the subject changed to the pending DCFS matter or her interactions with the various service providers and certain other entities, such as L.B.'s school district or the Elgin police department, Mary "had trouble discussing those cases positively."

¶ 44 Stephen developed a treatment plan for Mary based on her review of the prior therapist's plan, the assessment report prepared by Mary's psychotherapist, and her own observations. She identified three specific treatment goals for Mary: (1) become less guarded in her communication and develop skills to better communicate with the various service providers involved in her case; (2) develop coping skills to manage her emotions regarding DCFS and the various service providers involved in her case and other entities, including L.B.'s school, the police department, DCFS, and her cellphone service provider; and (3) gain an understanding of how DCFS and its affiliated service providers operate so that Mary could "lower her feelings that someone was out to get her," and work collaboratively with those entities to facilitate L.B.'s return to her care, as well as recognize that neither her cell phone nor L.B.'s school district were spying on her.

¶ 45 Stephen testified that Mary made no progress towards these goals during therapy. With respect to communication and emotional regulation regarding DCFS and the service providers, Stephen testified that they "could not even have the conversation" because Mary would "go on a long lengthy conversation with how they were doing her wrong," and Stephen was unable to interrupt or redirect those conversations. Mary also remained unable to regulate her emotions regarding DCFS and the service providers, and she did not use any of the coping mechanisms they had worked on together. Finally, Stephen testified that Mary did not understand DCFS' role or the process required for L.B. to be returned to her care and persisted in her belief that DCFS was

treating her unfairly and that L.B. should not have been removed from her care. Stephen elaborated that Mary erroneously believed that simply attending a few therapy sessions and parenting classes would result in L.B.'s immediate return, as well as that her cell phone and L.B.'s school district continued to spy on her.

¶ 46 Stephen testified that, after DCFS ceased covering the cost of Mary's services in April 2025, she encouraged Mary to continue therapy, but Mary did not respond. She agreed that Mary's mental health issues made it difficult for her to understand why L.B. was removed from her care and why she needed to cooperate with DCFS and engage in services. She further agreed that, had DCFS continued to fund those services, Mary would have continued to attend therapy.

¶ 47 Bruce testified that he did not understand why L.B. came into care. He stated that he was told only that he had neglected and failed to protect her, but he was not informed how he had done so. He emphasized that he did not have custody of L.B., but exercised visitation and paid child support. Bruce testified that he was unaware L.B. had an individualized education plan (IEP). Although he knew L.B. had a medical condition, he stated that he did not know how it was being treated. He described his relationship with his daughter as a typical, loving father-daughter relationship, explaining that they enjoyed reading, playing on the computer, and joking around together.

¶ 48 Bruce testified that he completed an eight-week parenting class online. After completing the class, he participated in "three or four" one-on-one parent coaching sessions, but parent coaching ended in October 2024 after the coach asserted that Bruce smelled strongly of marijuana and alcohol during a visit. Bruce also testified that he completed a psychiatric assessment at the Ecker Center in November 2024 and thereafter attended monthly appointments with a psychiatrist, during which they addressed what the psychiatrist described as an "anger management problem."

He ceased attending therapy after the court changed the permanency goal. He testified that he attended "one or two" child and family team meetings but did not know when all such meetings were held. He was unaware what an administrative case review was and that he did not attend any meetings with DCFS at which his progress in services was evaluated.

¶ 49    Bruce further testified that he submitted to numerous random drug screens but tested positive for cocaine. DCFS thereafter suspended his visitation and directed him to undergo a substance abuse assessment. Bruce testified that he participated in a substance abuse assessment at LSSI in early 2025 but did not participate in any substance abuse treatment. He had not had any visits with L.B. since his visitation was suspended in October 2024. After his visits were suspended, he did not send L.B. any gifts, cards, or letters, explaining that he was experiencing personal problems and health concerns. He detailed several such health conditions, including heart disease, high blood pressure, a history of stroke, and a hospitalization in the summer of 2024. Bruce asserted that these conditions affected his ability to complete required services and that he informed DCFS, though he could not recall the name of the individual he notified.

¶ 50    Bruce testified that he was homeless and was paying for his needs with disability and Social Security benefits. He asserted that, if L.B. were returned to his care, he would move with her to Minnesota, "with [his] older kids," and that he had the financial means to support her.

¶ 51    Stephanie Sanders, a public service administrator with DCFS, testified that she supervised L.B.'s case when L.B. first came into care and assumed primary responsibility for the case in May 2024, after the original caseworker left DCFS. Sanders testified that L.B. came into care because Mary "was acting erratic around the child and it prompted the police to make a hotline report." Mary was initially recommended for several services, including individual therapy, parenting and family therapy when deemed appropriate, mental health services, and visitation. With respect to

Bruce, Sanders testified that he was recommended for individual therapy, parenting education, mental health, and substance abuse services.

¶ 52    Sanders testified that both parents were initially referred to ROAN Solutions for individual therapy but refused to sign the consent forms. After Sanders took over the case in May 2024, she referred both parents to Brighter Side Counseling. Mary participated in weekly therapy sessions from the summer of 2024 until April 2025, when the permanency goal changed and DCFS stopped covering the cost of therapy. Mary was not satisfactorily discharged from therapy, nor was she referred for family therapy because, according to Sanders, "she wasn't making the progress she needed in her individual therapy." Bruce did not begin therapy services at Brighter Side Counseling and did not provide documentation showing that he had participated in therapy with another provider. Sanders denied that Bruce ever told her that anything in his personal life affected his ability to participate in therapy, but she acknowledged that Bruce reported during the integrated assessment in February 2024 that he had heart problems and high blood pressure.

¶ 53    Sanders testified that both parents were referred to ROAN Solutions for parenting education and that she received certificates of completion from both parents for the Circle of Security program. After completing parenting education, both parents were recommended for one-on-one parent coaching, and DCFS provided appropriate referrals. Mary completed all parent coaching sessions in December 2024 but was not successfully discharged. Bruce participated in only three or four sessions before ROAN Solutions discontinued services. Sanders explained that, in October 2024, ROAN Solutions reported that Bruce arrived at a visit "smelling of alcohol and marijuana" and that staff "did not feel comfortable with him being there under the influence with his daughter," so L.B. was sent back to her foster parents. As a result, Bruce's visitation was placed on hold until he completed a substance abuse assessment, which Sanders noted "was a

recommendation since case opening." DCFS referred Bruce to LSSI, which Sanders emphasized was the third such referral DCFS had provided to him. In late February or early March 2025, Sanders received the results of Bruce's substance abuse evaluation, which showed a positive test for cocaine in March 2025 and recommended intensive outpatient treatment. Sanders explained that LSSI could have provided that service without an additional referral, but Bruce did not participate in intensive outpatient treatment through LSSI and did not provide documentation showing completion of treatment elsewhere. Sanders testified that Bruce's visits with L.B. never resumed because, although she and her team agreed that visits could resume once he engaged in intensive outpatient treatment and produced clean drug screens, "that never happened."

¶ 54    Sanders testified that Mary was referred to the Ecker Center for a psychiatric evaluation, which she completed in December 2024. The evaluation did not recommend any treatment because, according to the evaluator, Mary was not forthcoming with information. Mary eventually participated in a second psychiatric evaluation, but the provider was unable to complete the sessions because Mary was "being erratic and combative."

¶ 55    Sanders testified that Mary initially had supervised visitation with L.B. once per week for two hours at a local library, which was supervised by the transportation provider, Amy's Sunshine Rides. After both parents completed the eight-week parenting class, Sanders conducted a walk-through of Mary's home, deemed it safe and appropriate, and moved visits to Mary's home in July or August 2024. In October 2024, however, Sanders received reports from the transportation agency that Bruce had been "erratic and disrespectful" towards staff. During a scheduled visit, Sanders and a DCFS case aide went to Mary's home. Bruce, who at that time was exercising visitation concurrently with Mary, "became irate, [was] going off," and stated that he did not "need four sets of eyes" observing the visit. Sanders testified that she told Mary she did not wish to end

the visit early but would do so if Bruce did not calm down. Mary also became upset, and Bruce's behavior escalated, becoming "more and more verbally inappropriate." Sanders ended the visit early, which caused L.B. to become very upset and cry because "[s]he really wanted to be with her mom and sister." Sanders testified that visits were thereafter moved back to the library and that Mary's visits never progressed to unsupervised or overnights.

¶ 56 Sanders testified that Mary attended all the child and family team meetings as well as all administrative case reviews. At a child and family team meeting in January 2025, after Sanders informed Mary that DCFS would likely recommend changing the permanency goal to substitute care pending termination of parental rights, Mary "became very irate, volatile, using a lot of profanities." Sanders told Mary she needed to calm down or she would be asked to leave. Mary continued "slamming books down and things of that nature," prompting a security officer to enter the room. Mary eventually left on her own, and Sanders subsequently notified her that she was no longer permitted to return to the DCFS office. In Sanders' opinion, Mary had not made progress toward reunification with L.B.

¶ 57 On September 11, 2025, after considering the trial testimony, the exhibits admitted into evidence, and the matters of which it took judicial notice, the court found that the State had proven by clear and convincing evidence that both parents were unfit.

¶ 58 Regarding Bruce, the court found that he did not maintain a reasonable degree of interest, concern, or responsibility for L.B.; failed to protect L.B. from conditions within her environment injurious to her welfare; and failed to make reasonable efforts or progress in his services. The court noted that Bruce appeared "disinterested" throughout the trial and testified that he was unaware of the reasons that L.B. was brought into care. It observed what it described as Bruce's poor "attitude," in that he believed his payment of child support and his exercise of visitation were

sufficient to protect L.B.  The court also noted Bruce's inability to recall what services were recommended for him and, when reminded of those services, the evidence demonstrated that he either did not meaningfully participate or failed to complete them.  For example, the court acknowledged that Bruce completed parenting education but found it insufficient, stating that he did so "by apparently sitting and at least having a body present there" and reporting he was listening.  It also noted that, when the case was opened, Bruce was referred for a substance abuse evaluation, but several referrals lapsed because he refused to participate.  He did not complete the evaluation until several months after his visitation was suspended, after a parent coach observed that he smelled of alcohol and marijuana during a visit.  The court further emphasized that Bruce tested positive for cocaine "fairly recently" and was recommended for intensive outpatient treatment, which he refused to participate in, despite the continued suspension of his visitation.  It also noted that Bruce did not send L.B. any cards, gifts, or letters during the period in which his visitation was suspended.  The court acknowledged Bruce's testimony that he was in poor health and had "a lot going on," but commented that his failure to do anything for L.B. or inquire about her progress in services demonstrated a lack of interest.  Finally, the court commented that Bruce remained homeless and had not presented any evidence that he could support or care for L.B.

¶ 59    The trial court then detailed its finding of parental unfitness regarding Mary.  It stated that, although she had made reasonable efforts to correct the conditions that were the basis for L.B.'s removal from her home in that she completed most of her services in a reasonable amount of time, she failed to make reasonable progress toward L.B.'s return and failed to maintain a reasonable degree of interest, concern, or responsibility for L.B.  The court stated it was clear Mary loved her daughter, but found that love alone was insufficient where L.B. was "taken to a police station *** and [was] anxious and nervous because of [Mary's] behaviors at that police station," was not

attending school, and was prevented by Mary from engaging in services because Mary did not want her information to be shared.

¶ 60 The court found that Mary was unable to address her mental health concerns, which the court noted were observed by multiple service providers, including her parenting educator, psychologist, psychiatrist, and individual therapist. According to the court, Mary was unable to "even contemplate trying to listen to them." The court detailed its review of Mary's second psychiatric evaluation, dated April 2, 2025, which diagnosed her with (1) delusional disorder, paranoid type; (2) anxiety disorder, not otherwise specified; and (3) suspected alcohol and other substance use. It noted that, when questioned about the evaluation, Mary asserted that the evaluator, Dr. Kartan, had "fabricated" the evaluation and stated that she intended to sue her. The court found that Mary's attitude toward her mental health issues impeded her ability to make any progress and, as a result, she had made no progress in this area. The trial court acknowledged that Mary was not required to agree that she had mental health issues, but that she nevertheless needed to make progress in understanding why L.B. was in care and to take accountability for that circumstance. Instead, Mary "took every opportunity" to state that the providers were lying about her mental health, noting that this "was her position all along," and that "her testimony clearly shows *** that that remains her position."

¶ 61 The court likewise commented on Mary's demeanor at trial, noting that she was frequently dismissive and argumentative, particularly when questioned about parent coaching or her psychiatric evaluation, and that she "was angry in her tone and in her volume," which the court stated were "things [that] wouldn't be reflected on the record, but they were clearly evident." Additionally, the court noted that other portions of Mary's testimony were confusing, rambling, grievance-filled, or not responsive to the questions asked.

¶ 62                                    B.  Best Interest Hearing

¶ 63     The case proceeded to a best interest hearing.  Sanders testified that L.B., then nine years old, had been in a traditional foster home since April 2024.  Before that, L.B. was placed with Bruce's ex-wife, but she requested that the placement be temporary because she lived in a one-bedroom assisted living arrangement with two other children.  Sanders attempted to find other family members for placement but "did not have a lot of viable options."  Sanders contacted Bruce's children in Minnesota, but they did not return her calls.

¶ 64     Sanders testified that she visited L.B.'s current foster home, which she described as safe and appropriate.  She detailed that L.B. lived with her foster mother and two other children; a 16-year-old boy and an 8-year-old girl.  L.B. had "a very loving relationship" with her foster family and looked to her foster mother for comfort.  She also got along very well with her foster siblings, particularly her foster sister.  L.B. also had her own bedroom and plenty of space for her personal belongings.  Sanders testified that when L.B. first came into care she was not attending school and was academically behind her peers.  Since coming into care, however, L.B. consistently attended school, had an IEP, and was receiving speech therapy and occupational therapy.  She described L.B. as "still behind" academically, but that she had made progress and was closing the gap.  The foster family had also included L.B. in gatherings with their extended family and had taken her on many vacations, including trips abroad.  Sanders testified that the foster family was willing to provide permanency for L.B. and to satisfy her care needs going forward.  Sanders opined that it would be in L.B.'s best interest to be free for adoption.  She explained that the foster mother was willing to continue to foster the bond between L.B. and Mary, but she was unsure whether the foster mother would do so with L.B.'s siblings.  She testified that Mary was "very resistant" and unwilling to allow the foster mother to support or facilitate the bond between L.B. and Mary.

¶ 65 During Sanders' testimony, the court admonished Mary to "stop *** slamming the table and using the F-word," stating that such conduct was not acceptable in court. The court acknowledged that the proceeding was highly emotional and explained that it preferred Mary to remain in the courtroom, but it warned that if she continued that behavior, it would find her in contempt of court and have her removed from the courtroom.

¶ 66 After considering all the evidence, the credibility of the witnesses, and the statutory factors set forth in section 1-3(4.05) of the Act (705 ILCS 405/1-3(4.05) (West 2022)), the trial court found that it was in L.B.'s best interest to terminate the parental rights of Mary and Bruce. In explaining its ruling, the court acknowledged that L.B. had expressed a preference to return home and live with Mary and L.B.'s adult siblings, but it found that the home was not stable and that L.B. required permanence in a safe and loving environment after being in care for nearly two years. With respect to Bruce, the court noted that he was homeless and suffered from health conditions that, according to his testimony, prevented him from writing letters to L.B., and it concluded that he therefore was unable to care for her. Conversely, the court noted that L.B. was thriving in her current placement, was bonded to her foster family, had made significant improvements in school and had developed a strong sense of self and security.

¶ 67 After the court announced its ruling, Mary asserted that DCFS had acted improperly, accused the court of "illegally taking [her] child," and stated that she would "be suing you all." She was then escorted out of the courtroom.

¶ 68 Respondents timely appeal.

¶ 69                                II. ANALYSIS

¶ 70 Counsel for both respondents seek to withdraw pursuant to *Anders* on the ground that there are no meritorious issues to be raised on appeal. *See*, *e.g., In re S.M.*, 314 Ill. App. 3d 682, 685

(2000) (*Anders* applies to cases relating to termination of parental rights). Under the procedure set forth in *Anders*, counsel's request to withdraw must be "accompanied by a brief referring to anything in the record that might arguably support the appeal." *Anders*, 386 U.S. at 744. This requirement is rooted in counsel's obligation to advocate on his or her client's behalf. *Alexa J.*, 345 Ill. App. 3d at 987. Accordingly, as to any such issue identified, counsel must "(a) sketch the argument in support of the issues that could conceivably be raised on appeal, and then (b) explain why he believes the arguments are frivolous." *S.M.*, 314 Ill. App. 3d at 685. Then, counsel should conclude that the case presents no viable grounds for appeal. Finally, counsel should include the transcripts from the adjudicatory and best-interest hearings. *Alexa J.*, 345 Ill. App. 3d at 989. Counsel should review both the finding of unfitness and the best interest determination and indicate in the brief that he or she has done so. *S.M.*, 314 Ill. App. 3d at 685-86.

¶ 71 Mindful of *Anders'* requirements, we agree with counsel for both respondents that there exists no viable argument that the trial court erred in finding respondents unfit or that termination of their parental rights is contrary to L.B.'s best interest.

¶ 72 Proceedings to terminate parental rights are primarily governed by the Juvenile Court Act (705 ILCS 405/1-1 et seq. (West 2022)) and the Adoption Act (750 ILCS 50/1 et seq. (West 2022)). The Act delineates a two-step process for the involuntary termination of parental rights. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). Initially, the State has the burden of proving by clear and convincing evidence that the parent is an "unfit person" under any ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). If the court finds the parent unfit, the matter proceeds to a second hearing, at which the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *Deandre D.*, 405 Ill. App. 3d at 953. The trial court is generally in the best position to assess the credibility of the

witnesses and, as such, we will not reassess credibility on appeal. Accordingly, this court will not disturb a trial court's finding regarding parental unfitness or a child's best interest unless the finding is against the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30. A finding is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 73 As noted, the State alleged in its petition to terminate parental rights that Mary and Bruce were both unfit for failing to: (1) maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2024))); (2) protect the minor from conditions within her environment injurious to her welfare (*id*. § 1(D)(g)); (3) make reasonable efforts to correct the conditions that were the basis for the minor's removal during the nine-month period from July 7, 2024, through April 7, 2025 (*id*. §§ 1(D)(m)(i), (ii)); and (4) make reasonable progress toward the return of the minor during the nine-month period from March 22, 2024, through December 22, 2024, as well as from July 7, 2024, through April 7, 2025, following the adjudication of neglect (*id*. §1(D)(m)(ii)). Additionally, the State alleged that Bruce was unfit for failing to make reasonable efforts to correct the conditions that were the basis for the child's removal during the nine-month period from March 22, 2024, through December 22, 2024. *Id*. At the conclusion of the fitness hearing, the trial court found that the State had proved all alleged grounds of unfitness, save for the State's assertion that Mary had failed to make reasonable efforts.

¶ 74 It is well established that any one ground of unfitness is sufficient to affirm the trial court's finding. See *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005) ("A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence"). Section 1(D)(m) of the Adoption Act, under which the court found both parents unfit, is phrased

in the disjunctive, and it provides two independent bases for finding a parent unfit: (1) the failure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any nine-month period following the adjudication of neglect; or (2) the failure by a parent to make reasonable progress toward the return of the child during any nine-month period following the adjudication of neglect. *In re C.N.*, 196 Ill. 2d 181, 210-11 (2001). Because a finding under either prong is sufficient, we need not address both grounds. We therefore elect to confine our analysis to respondents' failure, under section 1(D)(m)(ii) of the Adoption Act, to make reasonable progress toward the return of the child during the nine-month period from July 7, 2024, through April 7, 2025, as this ground alone is sufficient to support the finding of unfitness.

¶ 75 Whether a parent has made "reasonable progress" under section 1(D)(m)(ii) of the Adoption Act is an objective inquiry which requires the trial court to consider whether the parent's actions during a given nine-month period would support the court's decision to return the child home soon. *In re Phoenix F.*, 2016 IL App (2d) 150431, ¶ 7. Reasonable progress requires, at a minimum, "measurable or demonstrable movement" toward the goal of reunification. *In re Daphnie E.*, 368 Ill. App. 3d 1053, 1067 (2006). "The benchmark for measuring a parent's progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known and would prevent the court from returning custody of the child to the parent." *Id*. (citing *In re C.N.*, 196 Ill. 2d at 216-17).

¶ 76 Consistent with the procedure outlined in *Alexa J.*, Bruce's counsel identifies in his memorandum a potentially meritorious issue that could arguably support the appeal, namely that the record does not support a finding of unfitness because the State failed to establish, by clear and

convincing evidence, that Bruce did not make reasonable efforts or reasonable progress during the nine-month period from March 22, 2024, through December 22, 2024. Counsel emphasizes that Bruce suffers from multiple health conditions that materially impeded his ability to complete services, but he nevertheless completed parenting education, participated in a psychiatric evaluation and follow-up appointments, and obtained a substance-abuse evaluation.

¶ 77 We agree with Bruce's counsel that the potential issue identified lacks arguable merit because it depends on the broadest and most favorable interpretation of selected facts in the record. Although counsel focuses on the nine-month period from March 22, 2024, through December 22, 2024, the trial court also found that Bruce failed to make reasonable progress toward L.B.'s return during the nine-month period from July 7, 2024, through April 7, 2025. The record supports that finding. The integrated assessment recommended multiple services for Bruce, including individual therapy, parenting education and, if recommended parent coaching, a substance-abuse assessment and compliance with all recommendations, and random drug testing. The record shows that Bruce failed to complete the bulk of those services.

¶ 78 Bruce was initially referred to ROAN Solutions for individual counseling, but he refused to sign the releases of information necessary to engage in that service and the referral lapsed. After Sanders assumed responsibility for the case, she provided a second referral for individual counseling, this time to Brighter Side Counseling, which accepted Bruce as a client. However, Bruce persisted in refusing to sign the necessary releases, did not participate in any therapy sessions at Brighter Side Counseling, and provided no documentation demonstrating participation in therapy with any other provider.

¶ 79 Although Bruce completed parenting education, Traskaski testified that he was "very quiet" and failed to meaningfully engage during the group sessions. Traskaski acknowledged

Bruce's assertion that he was "actively listening," but explained that, when called upon, Bruce was unable to give examples of topics covered during the sessions or offer meaningful self-reports. She further testified that "Circle of Security" is not a program in which a parent can be "successful," as completion is based solely on attendance.

¶ 80    Based on his lack of engagement in parenting education, Traskaski thereafter recommended Bruce for one-on-one parent coaching sessions. However, Bruce did not sign the required release for that service until months later, in May 2024. He eventually began parent-coaching services in September 2024 but was unsuccessfully discharged the following month after appearing for visitation smelling of alcohol and marijuana. DCFS thereafter placed Bruce's visitation on hold and advised him that visits could resume if he obtained a substance-abuse evaluation and produced negative drug screens.

¶ 81    Sanders emphasized at trial that a substance-abuse evaluation had been recommended since the opening of the case, and that she had provided three such referrals for that service. The record reflects that Bruce did not seek a substance-abuse evaluation until January 2025, when he contacted Sanders to report difficulty in securing an evaluation. Bruce ultimately completed an evaluation in early 2025 at LSSI and informed Sanders that no recommendations had been made. Upon receiving the evaluation report from LSSI, however, Sanders learned that Bruce had tested positive for cocaine, and that intensive outpatient substance-use treatment was recommended. Despite that recommendation, and despite not requiring an additional referral for that service at LSSI, Bruce neither participated in intensive outpatient treatment nor provided documentation showing that he completed substance-use treatment elsewhere. Thus, despite having visitation suspended in October 2024, Bruce's visitation had not resumed by the time of the termination hearing nearly one year later, in September 2025, because Bruce failed to even begin the

recommended substance-abuse treatment. Additionally, once his visits with L.B. were suspended, Bruce sent her no cards, gifts, or letters, and he presented no evidence or testimony that his health prevented him from doing so. Bruce also refused to sign the release of information or participate in a psychological evaluation as outlined in the service plan. Against this backdrop, we cannot say that the trial court's finding that Bruce was unfit under section 1(D)(m)(ii) of the Adoption Act because he failed to make reasonable progress toward L.B.'s return during the nine-month period from July 7, 2024, through April 7, 2025, was against the manifest weight of the evidence.

¶ 82    With respect to Mary's unfitness, her counsel raises two potential contentions and concludes that neither would arguably support the appeal, namely that (1) the State failed to present sufficient evidence that she was unfit by clear and convincing evidence, and (2) she was denied effective assistance of counsel. However, counsel concludes that neither issue has merit because Mary persisted in her belief that she lacked any mental health concerns, which is the very reason L.B. was taken into care in the first place, and because, even assuming counsel's performance was deficient, there is no reasonable probability that the result of the proceeding would have been different absent counsel's errors.

¶ 83    We agree with counsel's assessment, as the record amply supports the trial court's finding of unfitness based on Mary's failure to make reasonable progress toward the goal of reunification. Although Mary participated in services, the record demonstrates that she treated those services as tasks to be completed but made no demonstrable progress toward the goal of reunification. During her trial testimony, Mary repeatedly emphasized her completion of the tasks outlined in her service plan, including by stating that she "did everything the lady told me to do," "completed my stuff that I'm supposed to do," and "cooperated with everything these people asked me to do."

¶ 84    At the same time, however, Mary continued to deny having any mental health concerns,

despite those concerns being identified by at least three service providers, and she actively resisted any treatment or intervention directed at those concerns. Instead, she asserted that she was the victim of a "fabricated situation" and a "fabricated" psychiatric evaluation, stating at one point during the unfitness hearing: "I don't believe half of what you all are trying to tell me. I'm not going to sit here and let somebody call me delusional, mental, and manic and all these disgusting things that I'm not." She also remained steadfast in her refusal to take antipsychotic medication. At trial, Mary further professed her intention to sue Dr. Kartan and various service providers, asserting that they were coordinating their efforts to remove L.B. from her care.

¶ 85    Mary's therapist, Stephen, testified that they "could not even have the conversation" regarding either Mary's mental health or her pending DCFS case because Mary would complain that she was being treated unfairly and wronged by others, which prevented meaningful discussion on those matters. Additionally, Stephen testified that a treatment plan was developed with specific treatment goals, but Mary made no progress toward those goals, and that additional therapy was necessary. Mary testified that she ceased participating in individual therapy once the permanency goal was changed, asserting, "I don't need it." The trial court was entitled to rely on Stephen's testimony in assessing Mary's progress.

¶ 86    The record also demonstrates that Mary also did not successfully complete parenting coaching, and ongoing coaching was required. Her visits with L.B. were never increased during the proceedings, but remained supervised, and she was unable to progress to overnight visitation. The record further reflects that Mary engaged in conflicts with service providers, resulting in her being barred from Help at Home and a DCFS office. The trial court also observed that Mary was angry during her testimony and expressed paranoid beliefs that DCFS, the police, L.B.'s school district, psychologists, psychiatrists, and her cellular service provider were acting against her,

which the court observed rendered her unable to rationally discuss those matters.

¶ 87    Based on the above evidence and testimony, we cannot conclude that the trial court's unfitness finding as to Mary is against the manifest weight of the evidence. Moreover, even if appellate counsel had argued that Mary's trial counsel rendered ineffective assistance of counsel, we discern no prejudice accruing from any alleged errors. See In re *A.P.-M.*, 2018 IL App (4th) 180208, ¶¶ 39-41 (noting that claims of ineffective assistance of counsel in termination proceedings require the parent to show both that counsel's performance was deficient and that the deficiency prejudiced the parent). Accordingly, we agree with counsel that there are no non-frivolous issues that could be raised on Mary's behalf.

¶ 88    Finally, both Mary and Bruce's respective counsel conclude that no viable argument could be raised by challenging the trial court's best-interest determination. The record reflects that, after both parents were found unfit, the proceedings were reconvened on September 11, 2025, for the best-interest hearing. At that hearing, the trial court considered all the evidence, the credibility of the witnesses, and the statutory factors set forth in section 1-3(4.05) of the Act and found by a preponderance of the evidence that it was L.B.'s best interest to terminate Mary and Bruce's parental rights because she was thriving in her foster placement and that L.B. required stability and permanency. We agree with counsel that no non-frivolous argument could be raised on appeal to challenge that determination.

¶ 89                                III. CONCLUSION

¶ 90    For the reasons stated, we grant counsels' motions to withdraw and affirm the judgment of the circuit court of Kane County.

¶ 91    Affirmed.